**CASE NAME:** Dory Turnipseed v Five Properties, LLC, et al.
**CASE NUMBER:** 06-18-2185-8

## I.        Jurisdiction

Complainant, Dory Turnipseed, is a woman with mental disabilities who alleges she was denied a reasonable accommodation and subsequently evicted in retaliation for exercising her right to a reasonable accommodation under the Fair Housing Act ("the Act"). Respondents are: Five Properties, L.L.C. (Property Owner), APMT L.L.C. d/b/a Tonti Management (Property Management Company), Kim Mamerto, (Property Manager), and Sherri Roane (Assistant at Tonti Management).

The last date of alleged discrimination was June 15, 2018, and the complaint was timely filed on June 18, 2018.
The subject property is a multifamily apartment complex named Sunlake Apartments located at 845 Joe Yenni Blvd., Kenner, Louisiana 70065. The exemptions under 803 and 807 do not apply. Neither Respondents nor the subject property receive federal financial assistance.

If proven, Respondent's alleged actions would violate Subsections 804(f)(1) and 804(f)(2), as defined by 804(f)(3)(B), and 818 of the Act.

> Subsection 804(f)(1) makes it illegal to refuse to rent after the making of a bona fide offer, or to refuse to negotiate for rental of, or otherwise make unavailable or deny, a dwelling to any person because of disability.

> Subsection 804(f)(2) makes it illegal to discriminate against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of disability.

> Subsection 804(f)(3)(B) makes it illegal to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

> Section 818 makes it illegal to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted or protected by Section 803, 804, 805, or 806 of this title.

## II.       Parties and Aggrieved Persons

A. Complainant
Dory Turnipseed
██████████████

Mesa, AZ 85204

EXHIBIT
**1**

Complainant Representative
Marcy I. LaHart, Esq.
249 SE Tuscawilla Road
Micanopy, FL 32667
Representing: Dory Turnipseed

Complainant Allegations

Complainant, Dory Turnipseed, is a person with a disability. Complainant resided at Sunlake Apartments, in Kenner, Louisiana. Sunlake is owned by Five Properties LLC, and is managed by APMT, LLC (d/b/a Tonti Management). Sherri Roane is an agent acting on behalf of APMT, LLC. Kim Mamerto, is the onsite manager. Collectively, they are the respondents in this matter.

Complainant alleges that on May 15, 2018, Respondents denied a reasonable accommodation for her emotional support animal, fined her $1,050 for bringing it on property, and threatened her with eviction. The Complainant could not afford the fine and retained an attorney to assist her with the reasonable accommodation request. Complainant again requested a reasonable accommodation on June 11, 2018 and was again denied with the $1,050 fine being upheld. Complainant alleges that she was subsequently evicted in retaliation for exercising her right to a reasonable accommodation.

Based on the forgoing, the Complainant believes she has been subjected to different terms and conditions, denied a reasonable accommodation, a refusal to rent, and was subjected to intimidation and retaliated against her for exercising her fair housing rights.

B. Other Aggrieved Persons

None

C. Respondents

APMT LLC d/b/a Tonti Management (Property Management)
Sunlake Apartments
4433 Conlin St.
Metairie, LA 70006

Kim Mamerto (Property Manager)
Tonti Management
Sunlake Apartments
800 Joe Yenni Blvd.
Kenner, LA 70065

Sherri Roane (Corporate Employee)
Tonti Management
Sunlake Apartments

4433 Conlin St.
Metairie, LA 70006

Five Properties, LLC (Owner)
4433 Conlin St.
Metairie, LA 70006

<u>Respondent Representatives</u>

James C. Rather, Jr.
Alker & Rather, L.L.C.
4080 Lonesome Road #A
Mandeville, LA 70448

Representing:   APMT LLC d/b/a Tonti Management (Property Management), Five Properties, LLC (Owner), Kim Mamerto (Tonti Management), Sherri Roane (Tonti Management)

<u>Respondent Defenses</u>

Respondents assert they were justified in denying Complainant's initial reasonable accommodation request because they believed she bought a letter from an online provider they "suspected of selling ESA 'prescriptions' for financial gain" and who was not licensed in the State of Louisiana. Respondents speculated that Complainant did not obtain a letter from her own regular healthcare provider because that provider thought it would be of no therapeutic benefit, or that Complainant did not meet the criteria.

Characterizing Complainant's reconsideration as a new request for a reasonable accommodation, Respondents argued they were entitled to contact Complainant's healthcare provider directly to verify her alleged disability. They further justified this decision based upon what they considered to be "questionable circumstances" of her initial accommodation request. Respondents claimed Complainant and her attorney failed to partake in the interactive process and were not acting in good faith by refusing to sign the medical release form to allow them to directly contact her second healthcare provider.

Respondents, by incorporating their court filings as a defense to the complaint, also claimed Complainant did not demonstrate that she is disabled within the meaning of the Act. During the investigation, they further alleged that the information Complainant provided failed to establish that she was disabled or that she needed an assistance animal.

Respondents further assert that the complainant was justifiably evicted for violating her lease agreement and incorporated animal addendum when she brought an unauthorized animal onto the property without prior approval and when she did not pay the subsequent fines levied when demanded.

Respondents objected to the complaint and HUD's investigation stating Complainant's claims were barred by res judicata stemming from the dismissal of her lawsuit in the United States District Court of the Eastern District of Louisiana.

D. <u>Witnesses</u>

Jeffrey Friedman
Friedman Family TX LLC
1800 South Ocean Drive
Hallandale, FL 33009

Peter M Mahony
Seaside Behavioral Center
4201 Woodland Drive
New Orleans, LA 70131

<u>Margarethe Turnipseed</u>
████████████████
New Orleans, LA 70124

## III.     Case Summary

A. <u>Interviews</u>

**Complainant: Turnipseed, Dory; (B44)**
Date of Interview: May 22, 2019
Type of Interview: In-Person
Interviewer: WALKER, SHIRLEY L.

On May 22, 2019, EOS conducted a brief interview with Complainant Dory Turnipseed. Complainant currently resides ████████████████████████ Metairie, Louisiana 70002.

Dory Turnipseed stated the following:

On April 13, 2018, Complainant moved into the subject property.  She did not move in with the ESA dog.  On that same day she received letter from social worker, Jeffrey Friedman, to have an ESA.

On May 9, 2018, Complainant emailed Respondent Sherry Roane the next day about status on approval for ESA.  Respondent Roane called two hours later an accused Complainant of buying a letter for ESA on the internet.  Complainant stated she found contact info for Jeffrey Friedman, LCSW, on the internet but did not buy a letter for the ESA.  Complainant stated sound like Respondent Roane said she was going to send Complainant and Mr. Friedman paperwork to sign.  Complainant stated she waited two (2) days and did not hear from Respondents.  Complainant stated she does not handle stress very well and decided to get her

dog and bring it home.

Complainant stated she was seeing a resident psychiatrist at Ochsner. Her doctor did not recommend or state that she needed an ESA for her anxiety condition which led her to seeking the social worker online. Complainant stated the only time she felt better is when she went to her parents' home to see the ESA.

Two days later, after not hearing from Respondents, Complainant called Respondents to inform them that she had brought the dog home due to her increased condition with anxiety. After returning from walking the dog, there was a notice on her apartment door stating Complainant owed $1050 for an unauthorized pet. Complainant stated she did not know why she was charged $1050. Respondents also stated that they would start eviction proceedings in 24 hours if she does not pay the $1050. Complainant had been residing at the subject property for one (1) month and a day before she brought the dog home. The dog had been at her apartment for two (2) days.

On May 15, 2018, Complainant contacted Jeffrey Friedman (Social Worker) and he referred her to Marcy La Hart (animal attorney).

On May 16, 2018, Ms. La Hart wrote a letter to Respondents' attorney stating reason for granting Complainant reasonable accommodation so that she would not be paying the fine. Ms. La Hart also stated in her letter that if she has not heard from Respondent by May 23, 2018, she would file a federal lawsuit. Complainant nor attorney received a response by May 23, 2018, so the lawsuit was filed.

On May 18, 2018, Complainant received an email from Respondent Roane inquiring if there were any other papers. Later in another email Respondent Roane asked Complainant if she wanted to terminate her lease. Complainant informed Respondent Roane that her attorney wanted all responses to go through her. Respondent Roane contacted Complainant via email again. Complainant Referred Respondent Roane to her attorney again.

Respondents never inquired about Complainant's need for the support animal.

June 3, 2018, Complainant was hospitalized for five (5) days at Seaside Behavioral Hospital for being suicidal. The attending psychiatrist, Dr. Mahoney prescribed the ESA for Complainant upon her release on June 8, 2018. Upon returning home on June 8, 2018, Complainant found the court ordered eviction letter.

One June 18, 2018, Complainant along with attorney attended eviction proceedings where the prescription for the ESA was presented. The eviction was upheld for not paying the fines sent by Respondents. The judge instructed Respondents to refrain from sending anymore fines. Following this order from the court, Complainant received at least three (3) more notices for a week's worth of rent.

On June 25, 2018, Complainant moved out of subject property.

On June 29, 2018, Complainant moved into new apartment. Management accepted her

documents for the ESA and approved the ESA the first day.

**Complainant: Turnipseed, Dory; (B45)**
Date of Interview: July 05, 2022
Type of Interview: Telephone
Interviewer: Sutterfield, Hunter

EOS Hunter Sutterfield interviewed Complainant Dory Turnipseed via telephone on July 5, 2022. Complainant stated that the state court evicted her based solely on the lease violation and did not look at the fair housing issue. The process of being fined and facing eviction is what caused her to feel worse and worse and led her to go to the hospital due to feeling suicidal. The hospital put her in a 5 day hold and took her to the Seaside behavioral center.

**Other Witnesses: Mahony, Peter; (B46)**
Date of Interview: July 12, 2022
Type of Interview: Telephone
Interviewer: Sutterfield, Hunter

EOS Hunter Sutterfield spoke with Dr. Peter Michael Mahoney via telephone on July 12, 2022. Dr. Mahoney stated that he treated Complainant Dory Turnipseed in 2018 when she was admitted to the Seaside behavioral institute. Dr. Mahoney oversaw the treatment of the Complainant from 6/3/2018 to 6/8/2018 and heard about her issues with the Respondents evicting her because of her ESA and her ESA letter they disputed. Without being asked by the Complainant, Dr. Mahoney believed that she was in need of having an ESA and that she would most likely benefit from one due to the nature of her condition.

**Complainant Contact: Other Witnesses: LaHart, Marcy; Friedman, Jeffrey; (B47)**
Date of Interview: July 13, 2022
Type of Interview: Telephone
Interviewer: Sutterfield, Hunter

EOS Hunter Sutterfield interviewed witness Dr. Jeffrey Friedman with Complainant Contact Marcy LaHart present via telephone on July 13, 2022. Dr. Friedman consulted with Complainant Dory Turnipseed back in 2018 about her need for an emotional support animal (ESA). Upon reviewing Complainant's medical history, which included having a psychiatric condition and medications and asking how her dog helped her mood and alleviated symptoms of her disability, Dr. Friedman wrote an ESA letter for her. Dr. Friedman mentioned that Complainant had worked as an EMT which was a very stressful job and that her medical and psychiatric conditions impacted major life activities for her. Dr. Friedman is typically contacted by physicians or directly from patients and in this case, Complainant herself wrote to him. In Complainant's letter, she made a detailed timeline showing that she had a long-standing history of issues. Dr. Friedman believes that Complainant would benefit from an ESA and that her condition is exacerbated when she can't have her ESA.

**Complainant Representative Hutton, Sherri L. (B48)**
Date of Interview: August 28, 2020
Type of Interview: Email
Interviewer: Reckley, Karen R.

Email interview between EOS Karen Reckley and Complainant Attorneys Marcy LaHart and Sherri Hutton.

At 12:13 PM August 29, 2020, EOS Reckley wrote to LaHart:
Please advise of the following:

To your knowledge, has there been any attempt to collect on the debt Respondents say Ms. Turnipseed owes (see attached final notice)?

Please state if the attached Doctor's letter was presented to the Respondents and/or their representative?

Please also state if the attached Doctor's letter was presented as evidence to the Judge prior to or during the eviction hearing.

LaHart, adding Complainant attorney Sherri Hutton to the email thread, responded:

> *My colleague Sherri Hutton represented Ms. Turnipseed in the state eviction action, and it was more than two years ago. However, my recollection is that the respondent did in fact attempt to collect the debt and Ms. Hutton was able to force Tonti to back off. I am copying her in this e-mail- Sherri- please correct me if I am wrong.*
>
> *The letter absolutely was provided to the Respondent's attorney On June 11, 2018, along with her discharge instructions- a copy of my email and the attachments I sent with the email is attached. Notwithstanding Tonti's awareness that TMs. [sic] Turnipseed's mental health had deteriorated to the point where she was involuntarily committed to a mental hospital, and having been provided the letter from Dr Mahony, Tonti's counsel demanded my client authorize him or another Tonti representative to speak with her psychiatrist. Specifically, he sent the document attached as exhibit K with an email stating:*
>
> *Good Morning, Ms. LaHart:*
>
> *My client has received your client's new request for accommodation of June 11, 2018. My client is reviewing the new materials now. In the meantime, and in conjunction with the ongoing interactive process, we would ask your client to execute the attached Release allowing my client to contact her healthcare providers to verify the disability as permitted by the FHA.*

*Finally, it is my recollection that the doctor's letter was both presented to the judge and filed with the court in the eviction proceeding. Sherri- again, if I am wrong, please correct me.*

At 12:56 EOS Reckley wrote:

Was the Doctor's letter from Seaside presented as evidence to the Judge prior to and/ or during the eviction hearing?

Can you provide a copy of Ms. Turnipseed's response to the eviction action that Respondents filed prior to the eviction?

At 12:59 EOS Reckley followed up with:

Provide any and all documents/evidence to show Respondents' attempt to collect on the debt after that final letter?

At 1:29, Hutton replied to Reckley's 12:59 email, writing:

*When Marcy forwarded me the email, the final letter was not attached. Can you forward a copy or tell me the date of that letter? I had a slew of communications with counsel for Tonti.*

At 1:49 Hutton replied to Reckley's 12:56 email, writing:

*Attached is the opposition we filed to the eviction. As I recall, I attempted to introduce supporting evidence in open court that the judge refused to let it in.*

Hutton's email attached a June 28, 2018 document titled "Exception of Lis Pendens with Exhibits, Rule" that she sent to the clerk of the 24th Judicial District Court Clerk. The letter reads:

*Enclosed please find a Declinatory Exception of Lis Pendens in the above-captioned matter. Please file the attached in the record, and I will hand deliver the original at the hearing which is scheduled for today at 9:00 a.m. regarding the above-mentioned matter.*

*Please confirm receipt and advise as to the applicable filing fees. Should you have any questions or concerns, please do not hesitate to contact me.*

At 1:59, EOS Reckley replied to Hutton:

See attached Final Notice.  I only need to see any and all documents/evidence to show Respondents' attempt to collect on the debt after this final letter?

At 2:12 Hutton replied to Reckley:

> *That Tonti demand letter was dated August 15, and sent it to me on the 20th. Her email is attached. I emailed Tonti's counsel a letter advising him to cease and desist, because all amounts had been paid per the Judgment. He did not respond.*
>
> *I asked Dory to let me know if she got any more collection letters. As of the last time I communicated with her she had not.*

Hutton's email attached two August 20, 2018 emails Complainant sent to her with the subject line being "Another Tonti Letter."

> *Complainant wrote to Hutton at 6:20 saying: "They have sent me another letter. I dont [sic] know what it is yet (but I can guess it's the same thing they've sent twice) I have to go pick it up from my parents house as soon as I can but just wanted to give you a heads up."*
> *Complainant followed up at 7:13 writing: "See attached. I am seriously beginning to feel like theyre [sic] harassing me."*
>
> *I'll send to the HUD investigator as well.*

At 2:21 EOS Reckley replied to Hutton:

So that I am clear, after your letter to Respondents' Representative dated August 30, 2018, regarding his and his clients' intent to collect a debt, there were no subsequent attempts by them to collect on this debt to date?

At 2:34 Hutton replied same day to EOS Reckley:

> *Not that I am aware of. I asked Dory to let me now if they did.*
>
> *I see an email I sent at the time, and recall that I made a call to the judge's clerk and asked her if I had misinterpreted the terms of the judgment, and explained what was happening. The clerk did not call me back. I sent the letter. I always wondered if the court made a call to opposing counsel and told him to knock it off.*

Hutton's email attached an August 21, 2018 email to Complainant about speaking with the clerk. Hutton wrote:

> *I just spoke with Judge Sullivan's law clerk who found this demand from Tonti to be surprising given the final order. She is going to think it over and call me back. I think that means talk to her boss, the Judge. I am sending Mr. Rather and his client a letter telling them (again) to cease and desist from sending any further letters. I may well have to file a motion to enforce the judgment and ask for a hearing, but I don't want to make a mess. I explained to the clerk that had we thought for an [sic] minute that we were cast with $11k in costs we would have appealed it. She is going to call me back.*

**Complainant: Turnipseed, Dory (B49)**
Date of Interview: January 11, 2023
Type of Interview: Email
Interviewer: Vanhook, Chanel

A list of follow up questions was sent to COMPLAINANT on December 8, 2022 to help answer outstanding questions the investigator had from the initial draft of the determination.

Complainant was asked why she didn't bring Sasha, the ESA, to live with her when she moved into Sunlake apartments and replied the "the complex did not allow pets and i [sic] felt i [sic] would be fine leaving sasha with my parents as long as i [sic] could visit often." Asked if she completed the Animal Lease Addendum as part of her lease COMPLAINANT was not sure and referred EOS to the documents provided when her complaint was initially filed.

Complainant was asked what lead her to seek out Dr. Friedman's services and responded "decline [sic] in mental health due to not having sasha. heard about emotional support animals and searched internet for information." When asked how she knew that Oschner didn't prescribe ESAs, CO stated it was because "i [sic] asked my psychiatrist directly through ochsner app."

Asked to describe how she felt when she first moved into Sunlake without Sasha, Complainant stated she felt "okay" and "optimistic." The next question asked Complainant to describe any change in her feelings as she continued to live alone at Sunlake with her ESA and replied that her "anxiety/depression worsened severely," that she was "unable to complete menial tasks" and also "unable to sleep."

Asked how she mitigated the symptoms of her having her ESA, she stated she was "already on medication" but realized "visiting for brief periods was not enough." When asked if she spoke to anyone about how she was feeling at the time Complainant stated she did not recall.

Next Complainant was asked to recall at what point she decided that her ESA needed to be with her and she replied "on May 9, 2018 I requested permission to bring Sasha to my apartment because I was seriously struggling without her. Tonti did not tell me when they would get back to me. on May 12, 2018 my mental health condition was deteriorating and I was afraid I was a danger to myself, so I brought Sasha to my apartment even though Tonti had not approved her yet because I was feeling desperate."

In the Digital Casefile (DCF) there is a printout of two emails that appear to be in response to messages from respondents, but FHEO did not have the other side of the conversation. As such, Complainant was asked what the context of the emails are.
The first email stated "My letter was not purchased off the internet. I advised that I found his contact information through the internet. He is more than happy to speak with you. And I have a legitimate diagnosis. My psychiatrist only stated that he did not prescribe ESAs." Complainant stated the reply was to Tonti's lawyer who "wrote me a letter saying I was a faker because the therapist that wrote the letter was not local, even though I had provided three years of psychiatric summaries verifying my diagnosis and treatment, tonti's lawyer said that Dr. Friedman had "sold" me a letter."

The second email read "I am bringing Sasha back to my parents house as I cannot afford any of your fines financially or emotionally…" and when asked Complainant said "it was in response to the threatening letter from the attorney and the notice saying I owed $1050.00 because of bringing Sasha to my apt."

Complainant was then asked to describe the events leading up to her involuntary commitment, known as a Coroner's Emergency Certificate (CEC) to Seaside Behavioral Center. Complainant said her CEC was due to "the stress from the issue with Tonti regarding having Sasha there put a huge strain on my mental health" and upon discharger she "very depressed, and anxious about losing my apartment."

Asked why she was evicted, Complainant answered "because I could not pay the $1,050.00 fine I was given for having Sasha in my apartment for a couple days" and that she was notified by a summons taped to her door.

In closing, Complainant was asked if there was anything else related to her case she thought we should know. To this she wrote "i have provided so much information on this incident from 4 years ago. i feel i was wronged by tonti and im still living with the immense fallout from being Page 152 hospitalized/evicted. i lost everything shortly after this entire ordeal. i cannot afford my medication anymore and the only thing keeping me here today is that i still have sasha with me."

**Complainant: Turnipseed, Dory (B50)**
Date of Interview: May 19, 2023
Type of Interview: Email
Interviewer: Vanhook, Chanel

Follow-on interview questionnaire completed by Dory Turnipseed that sought to develop her damages claims and gather answers to outstanding questions FHEO and OGC had about her interactions with Respondents.

Complainant was asked to provide bank statements, leases, contracts and the like that could document her previous damages claims. In response to this, Complainant replied "It has been almost five years since I was illegally evicted by Tonti, and I do not have documents related to most of the below. I have done my best to estimate each applicable category." Complainant then listed $905 in filing fees for the District Court and the Fifth Circuit Court of Appeals but did not provide. Complainant also listed $20,000 in attorney's fees.

When asked for any relevant additional costs incurred but not alluded to in the list from FHEO Complainant listed $50,000 with the justification penned as:

"Damages for lasting emotional distress experienced by (because of Tonti's actions including deterioration of one's mental health, stressed caused by prolonged investigation: $500,00.00 [sic] – I asked for permission to have Sasha for emotional support and provided a letter from my counselor Dr. Friedman. I received a letter from Tonti's attorney accusing me of having purchased the letter off the internet, my request was denied and I was commanded to pay $1050.00, a $600.00 fee for bringing my emotional support animal to my apartment when I was

in crisis, plus an additional deposit of $450.00. I was so distressed without Sasha and with Tonti threatening to evict me that I was involuntarily committed and required five days of hospitalization. My attorney provided Tonti a letter from the Staff Psychiatrist that had treated me at Seaside Behavioral Center asking that I be allowed to have Sasha, as well as records showing I had been hospitalized for severe depression and anxiety, but Tonti still refused to let me have Sasha or retract the fine and additional deposit and evicted me. My federal lawsuit could not go forward because of an arbitration agreement imbedded in the 20- page lease I had to sign."

Complainant included in this document answers to a number of questions FHEO had including whether she ever signed the medical release Tonti provided and she replied no "because my attorney Marcy LaHart told me that Tonti was not allowed to request permission to contact my healthcare providers."

Asked if she inquired about whether Tonti had a reasonable accommodation policy regarding ESAs she answered "I did ask them about reasonable accommodation and was told as long as i jumped through all of their hoops, I'd be granted reasonable accommodation."

When asked if Tonti mentioned a reasonable accommodation policy or furnished a policy during their interactions she replied "The office worker at the apartment said they did reasonable accommodations when asked and then told me the steps to take, which i followed" but that Tonti did not provide a written policy.

**Other Witnesses: Turnipseed, Margarethe (B53)**
Date of Interview: January 23, 2023
Type of Interview: Telephone
Interviewer: VanHook, Chanel
Margarethe Turnipseed was briefly interviewed on Monday, January 23, 2023. Mrs. Turnipseed said overall her daughter has been very private about the whole situation but that she could tell Complainant felt very beaten down over it.

Mrs. Turnipseed confirmed Dory had lived on her own before and that prior to moving to Sunlake, she was living in another apartment with a roommate, but had also lived on her own with the emotional support animal ("Sasha") before. About moving into Sunlake, Mrs. Turnipseed recalled that Dory had lived with her in between moving out of her previous apartment and moving into Sunlake. Mrs. Turnipseed stated she and her husband were not involved with the apartment search but thought Dory would have been looking for places "that would allow an animal on premises."

Mrs. Turnipseed said that being evicted left Complainant in an emotional tailspin where she was in "existence mode" and not eating or taking care of herself. According to Mrs. Turnipseed, Complainant was feeling a combination of "frustration, pain, anger, fear and anxiety." She stated Dory moved back into the family home for a while after the eviction as the ordeal really hurt her, was a big blow to her self-confidence, and affected how she looked at her life at the time. Upon being discharged from Seaside, Mrs. Turnipseed said Dory had no choice but to be more open with her parents about the extent of what was going on but was still overall private about the

matter.

The interview ended with Mrs. Turnipseed saying Dory had never had these issues with past apartment complexes so she was glad Dory was pursuing this matter and would not be doing so if she didn't feel she had been wronged.

**Complainant: Turnipseed, Dory (B55)**
Date of Interview: April 08, 2024
Type of Interview: Email
Interviewer: Vanhook, Chanel

**1. When did you first begin receiving treatment at Oschner?**
Response: I was born at an Ochsner hospital so birth I guess.
**2. Were you referred to Oschner?**
Response: No, I chose myself.
**3. Were there any facilities where you received treatment prior to seeking treatment at Oschner?**
Response: I don't know.
**4. What is the name of the doctor who was overseeing your care at Ochsner during the time you initially requested an assistance animal?**
Response: I don't remember. That should all be in the paperwork I submitted 6 years ago.
**5. Did you have a specific doctor you saw for your care?**
Response: I saw residents of the psychiatry program and as such, my doctors rotated every so often.
**6. Were you seeing any other medical professionals outside of Ochsner?**
Response: A primary care physician
**7. Who at Oschner did you ask to prescribe an assistance animal to you?**
Response: I emailed the doctor in charge of the residents.
**a. Was this person your regular psychologist/psychiatrist?**
Response: No, he was in charge of the residents.
**b. If not: who was?**
Response: I saw the residents.
**8. What specific reason was given for not issuing the assistance animal letter?**
Response: No reason was given, he replied to my email that "Ochsner does not do that."9. Was this communicated as an Oschner policy or personal policy of the practitioner?
Response: I was told "no." I submitted the response along with all the other paperwork I submitted 6 years ago. Since he said "Oschner does not do that" I assume that it was an Oschner policy but I do not know.
**10. How often did you meet with your psychologist/psychiatrist at Oschner?**
Response: Every 3 months I think. But I do not remember.
**11. Did you have the same physician while being treated at Oschner?**
Response: no
**a. If not: why?**
Response: I saw the residents and they rotated.
**12. Were you treated for anything other than ADHD and GAD at Oschner?**
Response: normal things/illnesses

**13. How were you initially evaluated by Jeffrey Friedman?**
Response: phone conversations
**14. How many times were you seen by Friedman?**
Response: I don't remember. We had multiple sessions as I recall.
**a. What was the purpose of each meeting?**
Response: For him to get to know me and my history of mental issues just as any doctor would do.
**b. How were these meetings conducted? (i.e. Phone, Zoom, email, etc.)**
Response: Phone as I recall.
**c. Approximately how long was the evaluation(s)?**
Response: I don't remember.
**15. What information did Friedman require you to submit for the ESA letter. (i.e. medical records, personal statements, etc.)**
Response: I don't remember. I think it was primarily based on our therapy sessions by phone.16. Were these meetings covered by your health insurance?
Response: no.
**a. If not, how did you pay for them?**
Response: out of pocket
**b. Did Friedman charge you specifically for writing the letter?**
Response: no
**17. Have you seen or consulted with Friedman since June 2018?**
Response: no
**18. During your stay at Seaside, how many doctors oversaw your care?**
Response: I don't remember. There was one main doctor but there were others.
**19. Was Dr. Mike Mahony one of the doctors who oversaw your care? Any other doctors?**
Response: yes
**a. How did Dr. Mahony come about writing a letter for you?**
Response: He knew about how I had tried to get permission for me to have Sasha with me at my apartment and about how Tonti had acted when I brought Sasha to my apartment when I was close to breaking down.
**b. Did he seek information from you for the letter? Did he have access to your medical history?**
Response: Dr. Mahony evaluated me several times over the course of my mandated stay at Seaside. He had access to my medical history because he was treating me while I was at Seaside.
**20. Have you seen or consulted with Dr. Mahony since that stay at Seaside?**
Response: no
**21. Are you still under the care of a medical practitioner for ADHD and GAD?**
Response: No. I only recently got health insurance again after years.22. Did you require further professional mental health services specifically as a result of Tonti's actions?
**a. If yes, for how long?**
Response: I lost everything after this happened so while I needed help, I could not afford health care for some time after this happened.
**22. Are you still under the care of a mental health professional for the issues arising from this case?**
Response: No, I only just recently got health insurance. I plan to find a therapist now that I have health insurance.

**Respondent: Mamerto, Kim (C10)**
Date of Interview: December 22, 2022
Type of Interview: Telephone
Interviewer: VanHook, Chanel
EOS Chanel VanHook and RD Christina Lewis from Region VI FHEO conducted an interview of Respondent Kim Mamerto who was on the call along with her representative, attorney James Rather. EBC Arlene Tillman Williams and EOS Danielle Barnes were also present for training.

Ms. Mamerto confirmed, when asked, that she works for Tonti Management and that she was then, and still is the leasing manager for Sunlake Apartments. Mamerto said her job requires her to do typical tasks such as "greeting guests, showing apartments, taking care of needs, administering and signing leases, and moving in duties." When asked if she ever interacted with Ms. Turnipseed, however, Ms. Mamerto said "none;" she had "no contact with Complainant at all."

When asked about the company's reasonable accommodation (RA) policy, Mamerto stated she believed the company had one but did not know if it was in writing nor what it said. She further stated the RA policy was more of a practice and not a policy. According to Mamerto, processing of RAs "depends on the accommodation" but that ESA requests all go to corporate. RA requests such as "parking spots, rails in bathrooms" and the like are typically approved at her level. Mamerto claimed that if an applicant has a visible disability, they are also typically granted their RA on property without having to be routed to corporate. RD Lewis pressed Mamerto on what the process would be to request an RA for an ESA and she said all requests are emailed to Sherri Roane in corporate.

Mamerto was then asked about Tonti Management's eviction process and whether she was involved in Complainant's eviction to which she stated no. She alleged she did not know who initiated the eviction process or who handled it. When asked if she knew why Complainant was evicted, Mamerto said she believed it was because of lease violations and that the lease violation would have been for an unauthorized animal. When asked who issued the lease violation, Mamerto stated she did not know who issued the violation but it could have been the bookkeeper and then a member of staff would have posted it on Complainant's door. However, Mamerto claimed she did not issue Complainant the lease violation but that it could have been another leasing agent or the bookkeeper. Mamerto was then asked who was involved in the decision and stated Sherri Roane at Corporate was. Asked why Sherri would have been involved, Mamerto stated it would be because of lease violations. Asked how Sherri would have been made aware of Complainant's lease violation, Mamerto states she didn't "know who sent the lease violation to Sherri" and elaborated "maybe the bookkeeper." More specifically, having an unauthorized animal and not having paid the additional fees demanded for said animal Mamerto then explained that bookkeepers typically handle evicting tenants but could not explain the process when asked for details.

Mamerto was also questioned about Tonti's pet policy and answered there is a "weight limit, cats must be declawed" and that they go over fees and additional deposits along with vet information. She further stated it is in writing and that Tonti routinely reaches out directly to the applicant's veterinarian to obtain information about the animal applicant wants to have on property.

The interview ended with RD Lewis pressing Mamerto on evictions again and trying to elicit more information about both Complainant's eviction and the overall process. Mamerto again said the bookkeeper handles all facets of the eviction and that the bookkeeper both then and now is named Donna Rish.

**Respondent: Roane, Sherri (C11)**
Date of Interview: December 22, 2022
Type of Interview: Telephone
Interviewer: VanHook, Chanel

EOS Chanel VanHook, RD Christina Lewis from Region VI FHEO conducted an interview of Respondent Sherri Roane who was on the call along with her representative, attorney James Rather. EBC Arlene Tillman Williams and EOS Danielle Barnes were also present for training.

Roane confirmed she worked for Tonti Management's corporate office back in 2018 at the time of the events as still does. However, when asked, Roane said she does not have a job title. Roane relayed her primary duties would be those of an office coordinator and a form of support to the properties Tonti manages, including Sunlake Apartments.

When asked, Roane recalls interacting with Complainant both over the phone and by email at the time of the events in question. Roane said Complainant first contacted her to request an RA for her ESA over email and that during a phone call that took place on May 10, 2018 she informed her it was a "legal process" that would take 7-10 days. She spoke with Complainant over the phone shortly after but claims no one else was on the call with her. When asked what documentation Complainant was directed to provide in support of her request Roane said it was "anything they want to provide" and denied there was any specific documentation required.

When asked about Tonti's RA Policy, Roane stated there was a written policy and it would be provided. Roane was asked whether the policy outlined the documents RA requestors need to submit and she again said no; it is whatever they want to submit. Roane was asked if the policy is the same for any person requesting an RA and she said it depends. Roane said that if a requestor has a visible disability such as walking with a cane they typically do not ask, but if there are no visible disabilities they might ask for a doctor's note. Further, Roane stated all ESA RA requests are forwarded to Tonti's attorney Mr. James Rather.

Roane was asked whether she knew what Complainant's first RA was for and she said she believed it was for an overweight animal. Roane said she did not know if it was approved or denied, who might have approved or denied it, and whether or not the decision was communicated to Complainant. Regarding Complainant's second RA request after being discharged, Roane stated that it was forwarded to Mr. Rather for disposition, but she did not know the outcome of that one either. She did state, however, that whatever the decisions typically are sent to the applicant directly from Mr. Rather.

Roane was also asked about Complainant's eviction and stated she was not involved in the decision to evict Complainant. When asked, Roane said the bookkeepers normally handle

evictions. Roane was also asked if anyone in the corporate office handles evictions and she said it was not her and she does not know who it is. Roane was also asked if she knew why Complainant was evicted and she said it was because of an unauthorized animal lease violation. When asked how she knew this she said she had seen the lease violation but didn't know or couldn't recall why she had cause to see it.

Finally, regarding Respondent's offer to Complainant a 48-hour penalty free release from her lease, Roane stated that she is the one who offered this to Complainant and that she did so in consultation with Mr. Rather.

**Respondent Representative: Rather, Jr., James (C12)**
Date of Interview: December 22, 2022
Type of Interview: Telephone
Interviewer: VanHook, Chanel

Following FHEO's interview of Respondent's Roane and Mamerto, RD Lewis had a brief conversation with attorney for Tonti management James Rather. RD Lewis asked Rather to describe his role in considering ESA requests for Tonti and he stated he typically receives all information submitted by the tenant and uses it to provide Tonti a recommendation on its disposition.

Rather opined on the skepticism he and Tonti had surrounding whether or not Complainant bought her ESA letter from Friedman or not and Friedman not being a Louisiana licensed provider was a "red flag" to him. He also claimed Friedman's letter did not state whether or not Complainant was disabled, nor did it state a nexus from Complainants disability to her need for an ESA. Rather mentioned that RPs felt Complainant had lost all credibility throughout the interactive process and that is why they felt the need to verify whether or not the Mahony ESA letter was valid or not. Rather stated he found it odd that Complainant would let Tonti contact Friedman but not Mahony and Seaside.

Regarding the eviction of Complainant, Rather opined that most evictions Tonti files are done by property staff and in the justice of the peace courts. Rather claimed that his atypical filing of Complainants eviction in the state court was because Complainant had involved LaHart and had representation. He clarified that it is not normal for him to be involved in evictions but that because Complainant attorneys had threatened litigation he was retained to file the eviction.

B. Documents

**Nature of Document: Animal Violation Notice from RP (B1)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 14, 2018
Date Obtained: June 05, 2018

Animal Violation Notice issued to Complainant notifying her that the lease requires that she pay "a sum equal to two (2) times the applicable non-refundable animal fee and an additional security

deposit of $450 upon demand by Lessor." The May 14, 2018 violation notice sent to Complainant, which contained Respondent Kim Mamerto's signature, began with the following statement, "We are aware of and have photographed an animal in your apartment that is not approved by the Rental Center. Your lease states, I (We) understand animals are permitted at Lessor's sole discretion and only after mutual written agreement between Lessor and Lessee." A handwritten notation at the bottom of the page indicated Complainant would have to pay a $600 non-refundable fee, and an additional $450 deposit (totaling $1,050).

**Nature of Document: Response to RP Opposition to Motion for Prelim Injunction (B2)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 04, 2018
Date Obtained: June 05, 2018

Complainant's Response to Respondents' Opposition to Motion for Preliminary Injunction. Complainant states that Respondent Tonti denied Complainant's reasonable accommodation request. The motion for the injunction is so that the fair housing discrimination complaint can be heard in federal court before the eviction is processed.

**Nature of Document: Letter from Sherri Hutton to James Rather (B3)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: August 30, 2018
Date Obtained: May 22, 2019

Letter from Complainant's attorney to Respondents' attorney regarding repeated attempts to collect alleged debts for eviction-related costs from Complainant. Complainant's attorney demands that Respondents cease contracting her client directly. Complainant's attorney states that the court had already denied Respondents request to recover attorney's fees and costs of eviction.

In this correspondence, Sherri Hutson writes:

> *I write in follow up to my email communications with you regarding Tonti Management's ("Tonti") repeated attempts to collect an alleged debt (attorney fees and costs of eviction) under the lease from my client, Ms. Turnipseed. As I mentioned in our email communications, Tonti has had ample opportunity to request attorney fees and costs, which it did in its petition for eviction, and the Court denied Tonti's request.*

> *Paragraph number 12 of Tonti's Petition for Eviction filed in the above referenced case states as follows:*

> *"Petitioners hereby pray for an Order evicting defendant from the subject premises, for a Writ of Possession, plus an Order awarding all amounts due under the Lease, including all attorneys' fees and Court costs".*

*Clearly, Tonti sought all amounts that might have been due under the lease in the Petition of Eviction. The case was heard, and Judge Sullivan, taking into consideration the demands in the petition and the oral arguments of the counsel; granted the eviction but denied any award of other amounts due under the lease. You drafted, and Judge Sullivan signed an order of Judgment dated June 26, 2018, that plainly states:*

*"Plaintiffs' claim for an award of amounts due under the lease is DENIED".*

*No suspensive or devolutive appeal has been filed. All time delays for an appeal of the Judgment have passed. Thus, Tonti's demand for attorney fees is barred by the doctrine of res judicata pursuant to LSA-C.C.P. art. 425 and LSA-R.S. 13:4231.*

*Please be advised that we continue to represent Ms. Dory Turnipseed. Thus, all correspondence regarding any matter arising out of the same occurrence or/and transaction as the eviction should be directed to us. Likewise, further extra-judicial requests for attorney's fees by Tonti or its counsel shall be directed to us.*

*Please consider this notice, that further attempts by Tonti or its counsel to contact my client directly, for the purpose of collecting this alleged debt will be in violation of 15 U.S. Code § 1692c. In the event Tonti concludes otherwise, please take an action judicially, and we will respond accordingly.*

*Should you have any questions or concerns, please do not hesitate to contact me.*

**Nature of Document: CP Email to EOS Walker (B4)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: May 22, 2019
Date Obtained: May 22, 2019

Email from Complainant forwarding email from Marcy LaHart explaining that since the court has granted Respondents motion to compel arbitration, she and Sherry Hutton will be unable to continue representing her without being paid. She recommends that Complainant proceed with the HUD complaint process.

**Nature of Document: Judgment of Eviction (B5)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 28, 2018
Date Obtained: June 05, 2019

Judgment of Eviction granted to Respondents. Honorable Judge Henry Sullivan signed the judgment on June 26, 2018. The judgment states that the Complainant must vacate the premises and deliver possession to the Respondents no later than Monday, June 25, 2018 at 9:00 a.m.

It also states Respondents' "claim for an award of amounts due under the lease is DENIED."

**Nature of Document: 20Jun18 1st Amended Complaint in USDC EDLA (B6)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 20, 2018
Date Obtained: June 05, 2019

Civil Action No. 18-5187 filed in U.S. District Court, Eastern District of Louisiana on behalf of Complainant by Marcy LaHart. The complaint is filed under the Fair Housing Act for discrimination. The background section lays out the Complainant's case at length explaining the damages she incurred from her reasonable accommodation request being denied and immediate action being taken against her by the Respondents.

Under "General Allegations", the pleadings state "Specifically, Turnipseed suffers from and has a history of suffering from depression with suicidal ideations, a Generalized Anxiety Disorder and Attention Deficit Hyperactivity Disorder, mental impairments that substantially affect her major life activities, including sleeping and concentrating."  Later the pleadings include the following, "Turnipseed was first diagnosed with depression and anxiety while in college and has experience panic attacks so severe that she lost consciousness."  The pleadings go on to note Oschner Psychiatry Resident Program for more than three years.

It is explained that in April 2018, Complainant chose to live independently from her parents and on April 13, 2018 signed a six-month lease with Tonti for an apartment at Sunlake. Complainant's dog, Sascha, was to remain with her parents in their home and the Complainant did not intend to take the dog with her to Sunlake.  After moving into her unit, Complainant began to experience symptoms of her anxiety.  Notably, "She has been extremely anxious, unable to sleep or concentrate, and is plagued by constant flashbacks at the death of a close friend by suicide.  She is also having flashbacks to extremely disturbing situations she experienced as an EMT."  Complainant was unable to minimize the effects of her anxiety but found that her dog reduced those effects.

It was at that point Complainant consulted with Dr. Jeffery Friedman, who "conducted a psychological evaluation of Turnipseed which included an interview and review of her lengthy mental health history …"  Subsequently, Dr. Friedman wrote her a letter verifying her need for the dog.

On May 9, 2018, Complainant contacted Tonti through its electronic portal for residents and requested the ESA.  Complainant then received a phone call from Sherri Roane, an Administrative Assistant, who asked complainant to submit documentation verifying Complainant needed the ESA.   "Per this request, Turnipseed emailed Ms. Roane the letter from Dr. Friedman, Sascha's vaccination records, adoption and training records, and summaries of Turnipseed's psychiatric appointments dating back to April 9, 2015."  Complainant followed up on May 10th, asking for an update and wrote, "I apologize for my impatience, I have been struggling to cope."  In response, Turnipseed received a phone call on May 10th from Respondent Roane and another employee.  Complainant was told she would have additional

paperwork to complete. Complainant claims the tenor of that call was so upsetting that it left her in tears.

"On May 12, 2018, Turnipseed became increasingly anxious and was fearful that she posed a danger to herself. Turnipseed went to her parent's home, picked up Sasha, and brought the dog to her apartment to help her cope with her extreme anxiety." On May 14, 2018, Complainant email Respondent Roane to follow up on the paperwork. In the same message she wrote she needed to speak to her therapist over the weekend "because the anxiety of waiting and anticipation was becoming unbearable to the point where I feared becoming a danger to myself." Later that evening, Complainant found a notice entitled "Animal Violation" on her door. A day later, Complainant received a letter from counsel for Tonti, James C. Rather, Jr., opining that she purchased letter off the internet, and that her request failed to meet the elements under the Fair Housing Act. Complainant wrote back and contested his assertion and explained that Dr. Friedman would be happy to talk to him. Mr. Rather never contacted him. On May 18, 2018, Complainant received an email from Roane asking if she intended to submit any additional documents. Complainant replied that she had counsel and had been advised not to communicate with them. Respondent Roane wrote back and offered her a 48-hour notice to vacate without any penalties or fees.

On May 28, 2018, Complainant was sued for eviction. On June 3, 2018, she was involuntarily committed because she was a danger to herself. Complainant's discharge papers included a letter from Dr. Mahony requesting she be allowed to live with an ESA. On June 11, 2018, Counsel resubmitted Complainant's accommodation request. In response, Respondents' counsel submitted a request for a medical release. On June 18, 2018, Complainant was evicted from the dwelling.

**Nature of Document: Emergency Motion for TRO and Prelim Injunction (B7)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 30, 2018
Date Obtained: June 05, 2019

Emergency motion for TRO and Preliminary Injunction filed by Complainant's attorney to stop eviction proceeding filed by Respondents. This is to allow the federal case to be heard on the fair housing discrimination allegations.

**Nature of Document: Petition for Eviction filed by Respondents (B8)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: 23 May 2018
Date Obtained: June 05, 2019

Petition for Eviction with exhibits filed by Respondents in state court. The eviction is based on Complainant violating her lease and other addenda by bringing an unauthorized dog onto the property prior to Respondents' approval and then for not paying the additional fees and deposits resulting from the violations.

The petition states that it came to Petitioners' attention that a dog defendant had not previously disclosed in writing was visiting and/or living in defendant's apartment in violation of the Lease. It continues "Defendant breached the Lease and is in default by permitting an unauthorized dog to visit and/or live in her apartment, and for failing to pay amounts due under the Lease for said Lease violations."

The exhibits included are the lease and other agreements that Complainant signed when renting the apartment.

Attached to the petition was Exhibit A which housed the Complainant's guest card reflecting that she would not bring an animal with her. Also in this exhibit is the Complainant's application packet where she circled "No" in the Animal Information section where it asked if she has any animals.

The exhibit also contains the Complainant's lease agreement which was signed on April 13, 2018. Attached therein was the Arbitration Clause, which was incorporated into the lease as an addendum. Also incorporated into the agreement was a section titled "A Note About Your Responsibility for Animals. This document included the following:

"Our largest expense item is repair and replacement of carpet and other property due to damage from animals."

"You have a duty to notify Lessor in writing if you now have an animal, acquire an animal in the future, or have an animal on the property at any time, whether you own the animal or not."

It goes on to state "Please carefully read and review the Animal Disclosure and Animal Lease Addendum that you signed. It is a legally binding document that will be enforced." However, the Respondents filing and exhibit, which includes the Complainant's executed lease, omits the aforementioned Animal Disclosure and Animal Lease Addendum.

**Nature of Document: CP Response to Final Notice to Pay (B9)**
Who Provided: Hutton, Sherri
How Transmitted to HUD: Email
Date of Document: August 30, 2018
Date Obtained: August 28, 2020

This document is Complainant's Representative's response to a Final Notice to pay monies Respondents alleged Complainant owed (attorney's fees and cost of eviction). The Complainant's Representative reiterates that the State Court denied Respondents claim for an award of amounts due under the lease and the Respondents may not recover it.

**Nature of Document: CP Rep Letter (LaHart) (B10)**
Who Provided: Representative
How Transmitted to HUD: Email

Date of Document: August 28, 2020
Date Obtained: August 28, 2020

This document is a Letter of Representation, which advises of Ms. LaHart's representation of the Complainant in this fair housing complaint investigation to HUD FHEO. It just states: "Please accept this correspondence as my confirmation that I do in fact represent Ms. Dory Turnipseed in her housing discrimination complaint filed against APMT, LLC d/b/a Tonti Management.

**Nature of Document: 11Jun18 LaHart 2nd RA Req Email to Rather (B11)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 11, 2018
Date Obtained: August 25, 2022

Copy of the email sent by Marcy LaHart to James Rather Jr. requesting reconsideration of Tonti's denial of Complainant's accommodation request. In the email, LaHart asserted:

"Our client was involuntarily committed last week because of her deteriorated mental state. Please review the attached and let me know if your client will reconsider its refusal to waive the weight restriction so that Ms. Turnipseed may have the therapeutic benefit of residing with her dog Sasha for emotional support."

Attached to the email were discharge instructions from the Complainant's involuntary committal to Seaside Behavioral Center, and a letter from the staff psychiatrist, Dr. Mike Mohany. Dr. Mahony's letter stated:

"Ms. Turnipseed was in the hospital for acute depression and anxiety, which she struggles with on a chronic basis. She has an emotional support dog which is essential to her emotional health and daily functioning. Please consider allowing presence of her dog in her living arrangement."

**Nature of Document: 11-15Jun18 LaHart 2nd RA Req Emails to Rather (B12)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 11, 2018
Date Obtained: August 25, 2022

An email exchange between Complainant Representative Marcy LaHart and Respondent Representative James Rather Jr. This email chain is dated between June 11, 2018 and June 15, 2018.

On June 11, 2018 at 11:13 AM, Complainant Representative wrote that Complainant Dory Turnipseed had been involuntarily committed to a hospital due to her disability deteriorating and had attached part of medical record and an ESA letter written by Dr. Mahoney.

On June 12, 2018 at 1:01 PM, Respondent Representative wrote that they acknowledged receiving the "new request for accommodation" and that "…My client is reviewing the new

materials now. In the meantime, and in conjunction with the ongoing interactive process, we would ask your client to execute the attached Release allowing my client to contact her healthcare providers to verify the disability as permitted by the FHA."

On June 12, 2018 at 12:27 PM (different time zone), Complainant Representative responded: "Demanding access to my clients [sic] medical records or healthcare providers is not part of an 'ongoing interactive process'- it is a violation of the FHA. My client already provided three years worth of summaries of her psychiatric treatment -far more than Tonti was entitled to.  Per HUD Notice FHEO-2013-01:[1]

> 'A housing provider also may <u>not</u> ask an applicant or tenant to provide access to medical providers or provide detailed or extensive information or documentation of a person's physical or mental impairments. (emphasis in the original)'

I have attached the actual notice and highlighted the relevant language for your convenience. …"


On June 14, 2018 at 2:42 PM, Respondent Representative wrote that he was not sure about the Complainant Representative's position and asks "Are you refusing my client's request to contact your client's healthcare providers to verify her disability?" Respondent Representative asserts that if they are, they would be contradicting their federal court pleading which claimed that Respondents "failed to engage in the interactive process by <u>not </u>contacting Mr. Friedman and her physicians at Ochsner." Respondent Representative claims this is contrary to the law and continues "…My client is allowed to verify your client's alleged disability by contacting her medical providers. …my client remains ready and willing to begin the verification process and to consider the new request for accommodation based on the new documents you supplied on June 11, 2018.  However, to do so my client needs the attached release signed by your client."

On June 14, 2018 at 3:16 PM, Complainant Representative wrote, in part:

"You and your client have been given more than adequate proof of Dory's disability but have chosen not to believe the information you have been given.
> …
To summarize, verification of my client's disability to date already provided to you and Tonti:

1) Her own statement. Per HUD and DOJ: 'Depending on the individual's circumstances, information verifying that person meets the Act's definition of disability can usually be provided by the individual himself or herself (e.g., …or **<u>a credible statement by the individual</u>**.)." (emphasis added)
> …
Again-you have failed to indicate any additional information you need that was not already provided. …

[1] FHEO-2013-01 is no longer current guidance; however, it was in effect at the time of the alleged violations. This guidance is related to service animals and assistance animals for people with disabilities in housing and HUD-funded programs.

Let's be clear, Dory has not made a 'new request'- your client has been provided with additional information to supplement the already adequate information it was provided weeks ago. …

Again, I want to be crystal clear, given the applicable standard, 'documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support,' I am having a hard time grasping why the documentation provided to date is inadequate.  …"

On June 15, 2018 at 4:49 PM, Respondent Representative wrote that he was not confused by Complainant Representative's pleadings and was not requesting "blanket access" to Complainant's medical records. Rather writes, in part: "…We also intend to exercise our rights under the FHA to verify this new documentation provided in support of her request.

What your client submitted on June 11, 2018 is indeed new, and the FHA permits my client to verify it. It is your client's right to withdraw and decline to allow us to do so by refusing to sign the release; however, that is an obstacle of her own choosing. …

Please let us know if she changes her mind. …"

**Nature of Document: CP Damages Worksheets (B13)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: December 9, 2022
Date Obtained: December 9, 2022

Document in Deliberative Section of case file.

**Nature of Document: RP Requested Medical Release Document (B14)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: June 12, 2018
Date Obtained: January 11, 2023

Copy of the medical release Tonti wanted Complainant to sign so they could contact her physicians directly. The release states "By signing below, I hereby authorize _____ to speak with and/or produce information to representatives of Tonti Management to verify my request for accommodation and/or modification of Tonti Management's policies and/or procedures."

There is a signature line for the tenant to sign and date.  There are also two lines for the "Animal Name" and the "Animal Description." Also present on the form is a derivative of HUD's Equal Housing Opportunity logo.

**Nature of Document: 11Jan23 CP Questionnaire (B15)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email

Date of Document: January 11, 2023
Date Obtained: January 12, 2023

Original document with Complainant's answers, transposed as is, to an interview questionnaire. The document is summarized in narrative format in the interview section of the DCF.

1. Why did you decide not to bring Sasha with you when you moved into the dwelling?
a. Did Tonti Management's pet policy have any part in your decision not to bring Sasha with you when you moved in initially? If so, why? (please explain.)
**the complex did not allow pets and i felt i would be fine leaving sasha with my parents as long as i could visit often**

2. Did you complete and sign Tonti Management's Animal Lease Addendum?
a. If yes: please provide a signed copy if available.
**unkown. please refer to the documents provided upon complaint.**

3. What led you to seek the services of Dr. Jeffrey Friedman? (ie, referral from physician, internet search, etc.)
**decline in mental health due to not having sasha. heard about emotional support animals and searched internet for information**

4. How did you learn that Oschner Medical Center did not prescribe emotional support animals?
**i asked my psychiatrist directly through ochsner app**

5. Please describe how you were feeling when you first moved into the property without your emotional support animal/Sasha?
**i felt okay, optimistic**

6. Please describe how your feelings changed as you continued living without it? For example, were you unable to sleep, unable to eat, worried, etc.?
**anxiety/depression worsened severely. unable to complete menial tasks. unable to sleep**
7. What steps did you take to mitigate those feelings? For example, did you begin spending more time at your parent's home with the dog?
**i was already on medication. visiting for brief periods was not enough**

8. Did you speak with someone about how you were feeling?
a. Who did you talk to about what you were feeling? Parents? Doctor? Friends or family? Anyone else?
**do not recall**

9. At what point did you decide that you needed to move Sasha in with you?
**on May 9, 2018 I requested permission to bring Sasha to my apartment because I was seriously struggling without her. Tonti did not tell me when they would get back to me. on May 12, 2018 my mental health condition was deteriorating and I was afraid I was a danger to myself, so I brought Sasha to my apartment even though Tonti had not approved**

**her yet because I was feeling desperate.** A list of follow up questions was sent to Complainant on December 8, 2022 to help answer outstanding questions the investigator had from the initial draft of the determination.

10. Please tell me about this e-mail interaction on May 15, 2018.
**on May 14 I emailed my contact at Tonti and told her I had brought Sasha here because I was having an extremely hard time, later that evening a notice was posted on my door stating I owed $1,050.00 as a fine for bringing Sasha here**
May 15, 2018 at 4:54 PM: "*My letter was not purchased off the internet. I advised that I found his contact information through the internet. He is more than happy to speak with you. And I have a legitimate diagnosis. My psychiatrist only stated that he did not prescribe ESAs.*"
i. What is this email in response to? (Please include original email if available.)
**tonti's lawyer wrote me a letter saying I was a faker because the therapist that wrote the letter was not local, even though I had provided three years of psychiatric summaries verifying my diagnosis and treatment, tonti's lawyer said that Dr. Friedman had "sold" me a letter**
*b. May 15, 2018 at 6:19 PM: "I am bringing Sasha back to my parents house as I cannot afford any of your fines financially or emotionally..."*
*i. What is this email in response to? (Please include original email if available.)*
**it was in response to the threatening letter from the attorney and the notice saying I owed $1050.00 because of bringing Sasha to my apt**

11. Can you tell me about the events that led up to r your involuntary commitment to the Seaside Behavioral Center at St. Luke's?
**the stress from the issue with Tonti regarding having Sasha there put a huge strain on my mental health**
a. When were you released/discharged?
**June 8, 2018**
b. How did you feel upon discharge?
**very depressed, and anxious about losing my apartment**

12. Do you know why you were evicted?
**because I could not pay the $1,050.00 fine I was given for having Sasha in my apartment for a couple days**
a. How were you informed that you were being evicted?
**a summons was taped on my door**
b. Did you receive any kind of violation notices during your tenancy outside of the ones related to your dog Sasha?
**No**

13. Is there anything else related to your case that you think would be helpful for us to know? **i have provided so much information on this incident from 4 years ago. i feel i was wronged by tonti and im still living with the immense fallout from being hospitalized/evicted. i lost everything shortly after this entire ordeal. i cannot afford my medication anymore and the only thing keeping me here today is that i still have sasha with me.**

**Nature of Document: Medical Records Documenting CEC (B16)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: June 03, 2018
Date Obtained: April 20, 2023

A printout titled Ochsner After Visit Summary, dated June 3, 2018, showing aComplainant that Complainant was diagnosed with suicidal ideations on the same day she was involuntarily committed to the Seaside Behavioral Center.

**Nature of Document: 19May23 Questionnaire (B17)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: May 19, 2023
Date Obtained: May 19, 2023

Follow-on interview questionnaire completed by Dory Turnipseed that sought to develop her damages claims and gather answers to outstanding questions FHEO and OGC had about her interactions with Respondents.

Complainant was asked to provide bank statements, leases, contracts and the like that could document her previous damages claims. In response to this, Complainant replied "It has been almost five years since I was illegally evicted by Tonti, and I do not have documents related to most of the below. I have done my best to estimate each applicable category." Complainant then listed $905 in filing fees for the District Court and the Fifth Circuit Court of Appeals but did not provide. Complainant also listed $20,000 in attorney's fees.

When asked for any relevant additional costs incurred but not alluded to in the list from FHEO Complainant listed $50,000 with the justification penned as:

> "Damages for lasting emotional distress experienced by (because of Tonti's actions including deterioration of one's mental health, stressed caused by prolonged investigation: $500,00.00 [sic] – I asked for permission to have Sasha for emotional support and provided a letter from my counselor Dr. Friedman. I received a letter from Tonti's attorney accusing me of having purchased the letter off the internet, my request was denied and I was commanded to pay $1050.00, a $600.00 fee for bringing my emotional support animal to my apartment when I was in crisis, plus an additional deposit of $450.00. I was so distressed without Sasha and with Tonti threatening to evict me that I was involuntarily committed and required five days of hospitalization. My attorney provided Tonti a letter from the Staff Psychiatrist that had treated me at Seaside Behavioral Center asking that I be allowed to have Sasha, as well as records showing I had been hospitalized for severe depression and anxiety, but Tonti still refused to let me have Sasha or retract the fine and additional deposit and evicted me. My federal lawsuit could not go forward because of an arbitration agreement imbedded in the 20-page lease I had to sign."

Complainant included in this document answers to a number of questions FHEO had including whether she ever signed the medical release Tonti provided and she replied no "because my attorney Marcy LaHart told me that Tonti was not allowed to request permission to contact my healthcare providers."

Asked if she inquired about whether Tonti had a reasonable accommodation policy regarding ESAs she answered "I did ask them about reasonable accommodation and was told as long as i jumped through all of their hoops, I'd be granted reasonable accommodation."

When asked if Tonti mentioned a reasonable accommodation policy or furnished a policy during their interactions she replied "The office worker at the apartment said they did reasonable accommodations when asked and then told me the steps to take, which i followed" but that Tonti did not provide a written policy.

**Nature of Document: 30Jul18 Eviction Bill Sent to CP (2nd) (B18)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: July 30, 2018
Date Obtained: Unknown

Second Notice sent to Complainant for $11,236.50. The notice is dated July 30, 2018 and states "Our records show that you continue to owe us $11,236.50, as explained to you on the Security Deposit itemization notice we mailed to you." It further stated that if the security deposit itemization is not paid within ten days then a $250 administrative collective fee would be added due to the lease's terms. Attached is the original bill that is dated July 11, 2018.

**Nature of Document: 10May18 CP Email to RP Roane Requesting RA Update (B19)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 10, 2018
Date Obtained: January 11, 2023

Email sent from Complainant to Sherri Roane requesting an update on her reasonable accommodation request. The email was sent on May 10, 2018 at 12:38 PM and states: "Good afternoon, I just wanted to check on the status of my reasonable accommodation request. I do not know how long this process usually takes. I apologize for my impatience, I have been struggling to cope. I appreciate your time. Regards, Dory Turnipseed."

**Nature of Document: CP Response to RP Attorney Email (B20)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 15, 2018
Date Obtained: January 11, 2023
Complainant's email to Respondents' attorney rejecting her reasonable accommodation request. On May 15, 2018 at 4:54 PM, Complainant wrote to Respondent's attorney: "My letter was not purchased off the internet. I advised that I found his contact information through the internet. He

is more than happy to speak with you. And I have a legitimate diagnosis. My psychiatrist only stated that he did not prescribe ESAs." Complainant also wrote on May 15, 2018 at 6:19 PM that: "I am bringing Sasha back to my parents house as I cannot afford any of your fines financially or emotionally. I am speaking to an animal lawyer and will respond when I have more information on my rights."

**Nature of Document: 14May18 CP Emails with RP S Roane (B21)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 20, 2018
Date Obtained: January 11, 2023

May 14, 2018 email traffic from Complainant to Sherri Roane regarding request for reasonable accommodation. The conversation is two follow on emails from complainant again asking for a response to her May 10, 2018 email requesting a status check on her reasonable accommodation.

The first email from Complainant is dated May 14, 2018 at 5:13 PM in which she states

> "As of today (Monday 5/14)1 still have not been contacted by anyone regarding the paperwork we discussed for reasonable accommodation. I spoke with my therapist over the weekend because the anxiety of waiting and anticipation was becoming unbearable to the point where I feared becoming a danger to myself. I picked up my dog on Saturday."

The thread continues with another email dated May 14, 2018 at 7:49 PM, approximately two and a half hours later after the previous one, where Complainant again emails Respondent Roane alerting her about an animal violation she received in the time between her 5:13 and this one. In this email Complainant reasserts that her anxiety is worsening due to the lack of a decision on her reasonable accommodation. Complainant writes,

> "At 7:00pm I received an "Unauthorized Animal Violation" notice from a Ms. Kim Mamerto. It states that I now owe $1050.00 tot this violation and the animal in question has been photographed inside my apartment. First of all I did not receive any notice whatsoever that someone would be entering my apartment when I was not here. I am not attempting to hide the dog as I have clearly stated. I brought her here on Saturday because by anxiety had become unbearable to the point where I feared I could become a danger to myself. I mentioned this in my email earlier today.
> I left copies of our correspondence, as well as another copy of my letter from Mr. Jeffery Friedman, LCSW and his contact info. In the door to the main office only 30 minutes ago. This violation notice states I have 24 hours to pay the fine or I face eviction. I ask that you please speak with Ms. Mamerto on this matter. I am being fully cooperative and eager to till out the appropriate paperwork, as is Mr. Friedman.
> As I have said many times, this is not a ruse of any sort. I am not trying to circumvent your protocols. This dog is absolutely necessary to alleviate my crippling anxieties. I do hope you are taking my request seriously. The notice on my door was extremely upsetting, since I have been trying to comply since last week. I hope for an amicable resolution to this issue but I am fully prepared to retain legal counsel and file a formal complaint with HUD."

**Nature of Document: 16May18 CP Rep LaHart ltr to RP Rep Rather (B22)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 16, 2018
Date Obtained: January 11, 2023

Letter from Marcy LaHart, Complainant's attorney to James Rather, attorney for Respondents' in response to the denial of Complainant's reasonable accommodation request. LaHart points out incorrect assumptions made by Rather in his denial letter and correspondence to the Complainant. Specifically, LaHart writes:

> *I have been retained by Dory Turnipseed to address Tonti Managment's [sic] denial of her request for a waiver of policies that would prevent Ms. Turnipseed from residing in her apartment with her dog Sasha for emotional support.*
>
> *Your May 15, 2018 correspondence makes several incorrect assumptions. Furthermore, your accusatory tone coupled with a threat of eviction is hardly indicative of a "collaborative process." In fact the demand that Ms. Turnipseed pay $1,050.00 for having brought her dog to her apartment when she was suffering from a severe anxiety attack and was fearful she might harm herself smacks of illegal retaliation.*
>
> *When Ms. Turnipseed applied to be a resident, she did not intend to bring Sasha with her, and had made arrangements to have the dog remain with her parents. She did in fact inform a Tonti Management [sic] employee, "Joanie," last name unknown, that she had a dog that would remain at her parents' house. That seems hardly relevant given that at the time my client entered the lease, she did not anticipate needing to bring Sasha to her apartment.*
>
> *Ms. Turnipseed "suddenly disclosed the existence of Sasha" only after she experienced a dramatic increase in her anxiety symptoms, which became so severe that she could not sleep and suffered frequent crying spells. Medications have not been effective in controlling Ms. Turnipseed's anxiety, and after leaving the dog with her parents she realized that the only time she truly felt relief from her anxiety was when Sasha was with her.*
>
> *My client did not purchase a letter from Mr. Friedman "off the internet." She had multiple telephone sessions with him. Mr. Friedman's opinion that Ms. Turnipseed needs the presence of her dog to help ameliorate the symptoms of her mental illness is based upon extensive telephone interviews as well as his knowledge of her current regimen of medications and her long history of struggles with depression and anxiety. Ms. Turnipseed has battled mental impairments through most of her adolescent and adult life.*
>
> *Your presumption that Ms. Turnipseed's psychiatrist refused to write a letter verifying my client's disability related need for an accommodation is "because he thought it would be of no therapeutic benefit, or you did not meet the criteria" is pure speculation on your*

part. Mental health care providers are often reluctant to draft letters regarding assistance animals for patients that would benefit from such animals solely because they fear being dragged into litigation and then required to take time from their practices for depositions and courtroom testimony.

While I do not know why Ms. Turnipseed's psychiatrist stated that he does not "write ESA letters," I do know that Mr. Friedman is well qualified to opine as to whether a person's disability would be ameliorated by living with an assistance animal. Mr. Friedman, soon to be Dr. Friedman, is a Licensed Clinical Social Worker with many years of experience in psychotherapy. He is familiar with the multiple peer reviewed studies documenting the mood stabilization effects and other therapeutic benefits of residing with companion animals. Given that someone can talk with their physician or nurse practitioner for five minutes and get a prescription for psychotherapeutic medications, I am confident that Mr. Friedman's independent assessment of Dory Turnipseed and his review of her psychiatric history are an adequate basis for his determination that she needs an emotional support animal.

As you are presumably aware, a housing provider has a legal obligation to make modifications to its rules, policies, practices, or services when such modification may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling. Waiving pet restrictions for disabled residents that rely upon emotional support animals is such a modification. HUD guidance regarding the appropriate level of inquiry regarding a resident's need for an emotional support animal provides that:

". . . the housing provider may ask persons who are seeking a reasonable accommodation for an assistance animal that provides emotional support to provide documentation from a physician, psychiatrist, **social worker,** or other mental health professional that the animal provides emotional support that alleviates one or more of the identified symptoms or effects of an existing disability. **Such documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability related assistance or emotional support."** (emphasis added) , Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs (April 25, 2013)

Tonti Management [sic] has been informed that Dory Turnipseed suffers from and has a history of suffering from mental impairments, and has been provided documentation that living with Sasha will assist her in managing her anxiety, ADHD and difficulty sleeping. Rather than granting her an accommodation, or even requesting addition information regarding her disability related need for an emotional support animal, Tonti Managment [sic] insinuated my client is a liar that is faking her disability, and flatly denied her request "because the information fails to satisfy essential elements of the FHA." No insight has been provided as to what additional information Tonti Managment [sic] feels is necessary in order to "satisfy essential elements of the FHA," and no specific information has been requested. Finally, my client has been commanded to pay $1,050.00 within 48 hours, and threatened with what would clearly be a retaliatory eviction. This conduct is not a "collaborative process," it is bullying of a person with disabilities in an

*attempt to convince her not to exercise her fair housing rights, and blatantly violates the FHA.*

*Ms. Turnipseed will not be paying the $1,050.00 penalty for seeking relief from an acute mental crisis in the companionship of her dog. If within 48 hours of this correspondence I have not received confirmation that Tonti Managment [sic] has waived any policy that would prevent my client from residing with her dog Sasha as an accommodation of her disabilities, I will promptly initiate a complaint against Tonti Managment [sic] for disability discrimination.*

**Nature of Document: Hutton/LaHart Support Memo re Prelim INJ USDC EDLA (B23)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document:
Date Obtained:

Memorandum in Support of Motion for Preliminary Injunction - unsigned and undated. The Memo states that the injunction should be granted because the Complainant will suffer immediate and irreparable injury unless a temporary restraining order and preliminary injunction is granted. The Complainant also argues that there is a substantial likelihood that they will prevail on the merits of the fair housing claims and the threatened injury to the Complainant outweighs any potential harm that the restraining order might cause the Respondents. Complainant also argues that injunctive relief is in the public interest.

**Nature of Document: 16May18 RP Atty Rather Email to CP (B24)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 16, 2018
Date Obtained: January 11, 2023

Email sent from James Rather, attorney for Respondents to Complainant after her May 15, 2018 response to RP's denying her reasonable accommodation request. The email was sent on May 16, 2018 at 1:48 PM and states that Respondents were fully cooperating with the Complainant during the process but that it is completely the Complainant's fault that she is being penalized because of her decision to bring her unauthorized dog to the property contrary to her lease and agreement to not do so. Rather states that they would be happy to look at additional information but that Jeffrey Friedman is merely a social worker in Florida and that the ESA letter was bought by the Complainant because her physician refused to write her one.

**Nature of Document: 1Jun18 Receipt for Prorated Rent (B25)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: June 01, 2018
Date Obtained: Unknown
Receipt from Respondents for prorated rent totaling $330. The payment date is listed as June 1, 2018 and the total payment with fees came out to $331.50.

**Nature of Document: 13Jun18 Eviction Show Cause Order (B26)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: June 18, 2018
Date Obtained: Unknown

Motion to Show Cause and Motion to Re-Set hearing signed by Judge Henry Sullivan, Jr. on June 13, 2018. Enclosed in the order is the original eviction petition and "Rule to Show Cause" that was signed and dated by Judge Sullivan on May 24th. That order had the original hearing scheduled for June 13, 2018.

Petition for Eviction states that the eviction is based on Complainant violating her lease and other addenda by bringing an unauthorized dog onto the property prior to Respondents' approval and then for not paying the additional fees and deposits resulting from the violations.

The petition states that " shortly after defendant took occupancy of the apartment, it came to Petitioners' attention that a dog defendant had not previously disclosed in writing" either on a guest card or when applying for tenancy was "visiting and/or living in defendant's apartment in violation of the Lease." It continues "Defendant breached the Lease and is in default by permitting an unauthorized dog to visit and/or live in her apartment, and for failing to pay amounts due under the Lease for said Lease violations."  The amounts being a $1,050 fine comprised of a $600 fee and an additional deposit of $450.

It also states that "Under the lease, all amounts are due when billed including but not limited to, fees and deposits for unauthorized animals" and that demand for payment was sent May 18 but that "[T]o date, defendant has failed to pay the amounts due."

On June 13, 2018, instead of the original show cause hearing taking place, Judge Sullivan granted petitioner's motion to re-set the hearing for June 18, 2018.

**Nature of Document: Declaration of Dory Turnipseed (B27)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 30, 2018
Date Obtained: January 11, 2023

Unsigned copy of Complainant's declaration filed in federal court. Complainant states that she has multiple mental disabilities and has received treatment for them and has been prescribed medications and an ESA. Complainant states in detail the traumatic experiences that caused her diagnosis and explains the interaction she had with Respondents around the Reasonable Accommodation request.

**Nature of Document: 15Aug18 Eviction Bill Sent to CP (3rd & Final) (B28)**
Who Provided: Complainant
How Transmitted to HUD: Email

Date of Document: August 15, 2018
Date Obtained: Unknown

Final notice sent to Complainant for $11,486.50, which includes an Administrative Collection Fee of $250. The notice is dated August 15, 2018.

Notice states: "Despite two prior requests, our records show that you have failed to pay us the amount of damages and charges that exceed the amount of the security deposit. The amount now owed is your original balance of $11,236.50 plus the $250 Administration Collection Fee for a total now due of $11,486.50. Please remit that amount immediately.

If we do not receive payment from you within 10 days, we will not hesitate to pursue any or all of the remedies permitted us by law, including referring the account to a collection agency and suing you in court. Also, be aware that according to the terms of your lease, we are entitled to the cost of collection, including attorney's fees starting at $350 plus courts costs, and interest."

**Nature of Document: ESA Docs Provided to RPs (B29)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 16, 2013-February 1, 2018
Date Obtained: Unknown

Veterinary shot records from Abadie Veterinary Hospital, LLC dated 2/1/2018; adoption contract from Louisiana SPCA dated 6/16/2013; Louisiana SPCA obedience training certificates dated 10/18/2013 and 12/14/2015; Louisiana SPCA certificate for agility for fun training dated 5/10/2016.

**Nature of Document: ESA Letter: Mike Mahony, MD (B30)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: June 08, 2018
Date Obtained: Unknown

ESA Letter from Complainant's psychiatrist who treated her during her involuntary commitment to Seaside Behavioral Center for suicidal ideations. Penned upon her discharge by Dr. Mahony, it states: "Ms. Turnipseed was in the hospital for acute depression and anxiety, which she struggles with on a chronic basis. She has an emotional support dog which is essential to her emotional health and daily functioning. Please consider allowing presence of her dog in her living arrangement."

**Nature of Document: Jeffrey Friedman Biography (B31)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 23, 2018
Date Obtained: Unknown

Biography of Jeffrey Friedman, a licensed social worker in Florida, who provided Complainant's first ESA letter. It states that he is "well versed in treating individuals with mood or anxiety issues."

**Nature of Document: ESA Letter: Jeffrey Friedman, LCSW (B32)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 05, 2018
Date Obtained: Unknown

Letter from Jeffrey Friedman, licensed clinical social worker, explaining that Complainant needs an ESA. The letter states: "I have assessed Ms. Dory Turnipseed on 04/23/2018 and I am familiar with her history and the limitations imposed by her disorder. Ms. Turnipseed has been dealing with symptoms of an emotional disorder found in DSM-V for the past three years. This is due to a history of traumatic events in her life. Her Emotional Support Animal is a dog that is a mixed hound breed. She has trained her ESA extensively. She benefits from having her emotional support animal in her residence. Her disorder affects her daily life and particularly her sleep and helps her to manage her anxiety and ADHD symptoms. Having her ESA provides her with a feeling of safety and security. As reasonable accommodation please allow Ms. Turnipseed to keep her ESA in her residence. This accommodation is supported by the fair housing act (FHA)." This letter was dated May 5, 2018, and signed by Jeffrey Friedman, LCSW Florida.

**Nature of Document: 11Jul18 Eviction Bill Sent to CP (1st) (B33)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: July 11, 2018
Date Obtained: Unknown

Itemized bill sent to Complainant outlining the following:

DEDUCTIONS FROM SECURITY DEPOSIT:

| | |
|---|---|
| Forfeit security deposit - evicted | $575 |
| One key not returned | $25 |
| Removal of excess trash | $25 |
| Cost of eviction | $11,184.50 |
| Photo charge for documentation, | |

TOTAL DEDUCTIONS FROM SECURITY DEPOSIT       $11,811.50.

The document showed Respondents Tonti and Five determined Complainant forfeited her security deposit due to being evicted, and they did not intend on returning it.

**Nature of Document: 14May18 CP Email to RP Roane Re Update on RA (B34)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email

Date of Document: May 14, 2018
Date Obtained: January 11, 2023

Emails between Complainant and Sherri Roane regarding the ESA request. On May 14, 2018 at 5:13 PM, Complainant wrote:

"As of today (Monday 5/14) I still have not been contacted by anyone regarding the paperwork we discussed for reasonable accommodation. I spoke with my therapist over the weekend because the anxiety of waiting and anticipation was becoming unbearable to the point where I feared becoming a danger to myself. I picked up my dog on Saturday. I realized that you advised me to wait until the process was finished, but I couldn't. I am trying to go through the correct process, but as someone with severe anxiety, this is unacceptable. It very possibly could have escalated to suicidal ideations just waiting for someone to contact me. My therapist has offered to get a legal advice for me since I don't feel like my request is being taken seriously and felt like I was being labeled a liar and a fraud even though I gave you additional medical history information. Again, I am trying to follow the policies you have in place, but you must realize what waiting and anticipation and uncertainty does to someone like me. I will not elaborate more on my mental health diagnoses. My therapist is aware not only of my mental history, but also of the specific events in my life which led to my diagnoses. Please contact me so that I can move forward with this process."

**Nature of Document: 21Jun18 RP Notice to CP re: Rent (B35)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: June 21, 2018
Date Obtained: Unknown

Notice directing Complainant to pay prorated rent totaling $132 for June 16-24, 2018. The notice dated June 21, 2018 states that "Our office put a note on your apartment door on 6/19/18 reminding you of rent owed for the period of 6/16/18 to 6/24/18 in the amount of $132.00. Our office has not received your rent. Please make payment today, 6/21/18."

**Nature of Document: 15May18 RP RA Denial from Rather (B36)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 15, 2018
Date Obtained: January 11, 2023

Letter from Respondent Attorney James Rather to Complainant of behalf of Tonti Management rejecting her request for a reasonable accommodation. In the letter dated May 15, 2018, Rather highlights every instance he asserts Complainant claimed to have no animals and that she understood the penalties for bringing an animal to the property. Rather writes:

"I represent Tonti Management in connection with your request for accommodation under the fair Housing Act, 42 U.S.C. §3601, et seq. ("FHA"). On May 9, 2018, you initially requested an accommodation of my client's policies and procedures relative to animal

weight restrictions, fees and deposits. In particular, on May 9, 2018, you submitted information indicating that, after moving in on April 13, 2018, a social worker who remotely assessed you via the Internet and telephone from Aventura, Florida on March 23, 2018 prescribed an Emotional Support Animal on May 5, 2018, only after your healthcare provider at Ochsner refused to do so. You have never been seen by the remote social worker, Mr. Friedman, and only spoke to him briefly by telephone.

You described the animal as a 6 year-old, thirty-five pound Plott-Hound mix named Sasha. You have had Sasha since 2013. On March 30, 2018, you completed a guest card indicating that you had no animals. You applied for the apartment that same day, again signing an application clearly stating you had no animals and that all statements on the application were true and complete. On April 13, 2018, you signed the Lease and Animal Disclosure and Lease Addendum, stating for the third time you had no animals. On May 9, 2018, you suddenly disclosed the existence of Sasha, not as the very same pet you have had for 5 years and failed to disclose, but as a newly-prescribed Emotional Support Animal you had "no idea your doctor would prescribe."

Based upon the information presented, my client must deny your request because the information fails to satisfy essential elements of the FHA. Moreover, in addition to the questionable circumstances described above, the social worker's letter appears to have been purchased off of the Internet. You stated your own healthcare provider at Ochsner declined to write a prescription for an ESA, presumably because he thought it would be of no therapeutic benefit, or you did not meet the criteria

In the meantime, my client is aware that you have brought the animal into your apartment even though it violates the Lease and you agreed not to do so in two separate telephone conversations. Violations of the Apartment Lease and incorporated Animal Disclosure and Lease Addendum result in a $600.00 fee plus an additional deposit of $450.00, for a total amount due of S1.050.00. You are responsible for this amount, which is due now. Please make payment within 48 hours, and cease and desist from bringing any unauthorized animals onto the property. Otherwise, my client may exercise its right to file for eviction should you again fail to comply with the terms of your lease.

If you have any additional information you wish my client to consider, please send it to me no later than the close of business tomorrow so we may continue this collaborative process."


**Nature of Document: 23May18 Hutton/LaHart USDC EDLA Complaint (B37)**
Who Provided: Marcy LaHart
How Transmitted to HUD: Email
Date of Document: May 23, 2018
Date Obtained: January 11, 2023

Complaint and demand for jury trial filed in federal court on behalf of the complainant. The Complaint states that Complainant is disabled and that the Respondents violated the fair housing act against her by denying her reasonable accommodation and moving for eviction against her.

**Nature of Document: CP's Chronology of Events (B38)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: Unknown
Date Obtained: Unknown

Chronology of events prepared by the complainant. The letter begins by explaining her personal background and mental health history. Complainant then creates a timeline of events from March 30, 2018 to July 17, 2018 which entails the entire process of signing her lease and moving in, to getting ESA letters, making a reasonable accommodation request and facing eviction. A brief description of each date, all of which are in 2018, and its corresponding events per the Complainant is as follows:

- 30 March: Paid security deposit, signed lease and had conversation with the leasing agent named Joan about their dogs.
- 13 April: Complainant moved into Sunlake Apartments.
  - Complainant states that a few days after moving in, she "began experiencing severe anxiety" causing her to "[break] down at work a few times" and that she "could not sleep" so she "asked her psychiatrist if he prescribed emotional support animals and he simply replied that he did not."
- 5 May: Received ESA letter from Friedman
- 9 May: Requested RA from Tonti via its online portal. Received phone call from RP Roane seeking additional information be sent via email
- 10 May: Complainant emailed RP Roane about RA status
- 12 May: Complainant suffered a major anxiety attack with suicidal ideations so she brought the ESA on property
- 14 May: Complainant emailed RP Roane again asking for an update on her RA and informed them she brought her ESA on property. Took ESA for a walk and returned to an animal violation and $1,050 on her door.
- 15 May: RP attorney Rather emailed the RA denial letter to Complainant. Complainant retained attorney Marcy LaHart to help with the RA.
- 16 May: LaHart emailed Rather a representation letter seeking reconsideration of RA decision and fine.
- 18 May: RP Roane emailed Complainant seeking additional supporting documentation for RA, Complainant directed Roane to communicate with LaHart. Roane then again emailed Complainant offering a penalty-free lease release. Complainant again directed Roane not to contact her directly.
- 23 May: Complainant filed federal lawsuit.
- 3 June: Complainant began suffering from suicidal ideations and went to Ochsner's ER where the attending physician CEC'd her resulting in a 5-day committal at the Seaside Behavioral Center for psychiatric intervention and treatment.
- 8 June: Complainant returned home following release and found an eviction notice on her door.
- 18 June: Complainant is evicted in state court and Tonti is denied any payment for fines stemming from the animal violation or the eviction.
- 25 June: Complainant moved out of Sunlake Apartments
- 17 July: Complainant received $11,236.50 bill from Tonti

**Nature of Document: Tonti Management Application Packet (B39)**
Who Provided:
How Transmitted to HUD:
Date of Document:
Date Obtained:

Blank, unfilled and unsigned Application Packet for Tonti Management. Document provides space for an applicant to input identification information, employment history, animal information, and occupant information.

Form also asks applicant to pay a fee, authorize Tonti to verify employment and income, past rental and mortgage information and includes a "Statement of Rental Policy" which outlines the community rules.

**Nature of Document: 1Jun18 RP Return of Funds Notice (B40)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: June 01, 2018
Date Obtained:

Return of funds notice sent to Complainant with her voided rent check in the amount of $660. The funds were returned because they sent her a note on May 28, 2018 to only pay a prorated rent for June 1, 2018 to June 15, 2018 in the amount of $330 which is now due on June 1, 2018.

**Nature of Document: 28May18 RP Prorated Rent Notice to CP (B41)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: May 28, 2018
Date Obtained: Unknown

Handwritten notice titled "Speed Message" directing Complainant to pay prorated rent in the amount of $330 "for 6/1/18-6/15/18." The notice also informs Complainant there is "a court date for 6/13/2018" and that "[a]ny further correspondence will be forthcoming pending court hearing."

The message is accompanied by a check from Complainant to Respondents in the amount of $660 for "854-23 Rent in full."

**Nature of Document: 13Jun18 RP Prorated Rent Notice to CP (B42)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: June 13, 2018
Date Obtained:

Notice directing Complainant to pay prorated rent totaling $66 for June 16-18, 2018.

**Nature of Document: 19Jun18 RP Prorated Rent Notice to CP (B43)**
Who Provided: Complainant
How Transmitted to HUD: Email
Date of Document: June 19, 2018
Date Obtained:

Notice directing Complainant to pay prorated rent totaling $132 for June 16-24, 2018. The notice included a form titled "30 Day Notice/Intent to Vacate Apartment" Tonti requested she fill out. The notice asks Complainant to "give your forwarding address so can send the Security Deposit form to you."

**Nature of Document: 15May18 CP Email to RP Atty James Rather (B51)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: May 15, 2018
Date Obtained: January 11, 2023

Emails Complainant sent to James Rather on May 15, 2018

At 6:19 PM Complainant writes:

"I am bringing Sasha back to my parents house as I cannot afford any of your fines financially or emotionally. I am speaking to an animal lawyer and will respond when I have more information on my rights."

At 10:24 PM Complainant writes:

"A final note:
I did inform Miss Joanie(?) twice that I had a dog that would not be moving in with me. I told her that she was staying with my parents and that's the reason for my short 6 month lease. I told her when I paid my security deposit and also on my move-in date.
At the time, I did not have any indication that my mental health would suffer as it did.
This statement is 100% true, as is everything I have said previously"

**Nature of Document: 8Jun18 CP Email to EOS Barnes (B52)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: June 08, 2018
Date Obtained: April 20, 2018

Emails between Complainant and EOS Shelley Barnes during the intake phase of her complaint. EOS Barnes sent an email on June 6, 2018 that sought to develop more details about Complainant's complaint and asked her for clarification on a number of questions. Complainant responds that she had just been discharged from a hospitalization and provided EOS Barnes with the required information. Complainant clarifies the positions RPs Kim and

Sherri hold at Tonti Management, her move in date, details surrounding her initial RA with relevant information provided, and states while threatened with eviction, at that time she had not received an eviction notice yet.

Complainant also describes the emotional toll the process has taken on her stating that the uncertainty caused her to have "several anxiety attacks which culminated in a crisis of Major Depressive Disorder" leading to her 5-day hospitalization at Seaside Behavioral Center. Complainant also informs EOS Barnes that the treating psychiatrist at Seaside authored an ESA letter for her as well.

**Nature of Document: CP Storage Rental Agreement (B54)**
Who Provided: LaHart, Marcy
How Transmitted to HUD: Email
Date of Document: June 20, 2018
Date Obtained: April 20, 2023

Document submitted in support of damages claims and is Complainant's post-eviction Rental Agreement from Safeguard Self Storage. Agreement outlines Complainant rented a 5x10 unit for $125 monthly through the life of the lease. It is not clear how long the lease is to last nor does it have and end date.

**Nature of Document: Representation Letter from James Rather (C1)**
Who Provided: James Rather
How Transmitted to HUD: Fax
Date of Document: July 02, 2018
Date Obtained: July 02, 2018

Letter informing HUD that James Rather represents the respondents and requesting an additional ten days to respond to the complaint.

**Nature of Document: Respondents' Answer to the Complaint (C2)**
Who Provided: James Rather
How Transmitted to HUD: Fax
Date of Document: July 12, 2018
Date Obtained: July 12, 2018

Respondents answer to complaint incorporating "by reference herein all factual allegations and defenses asserted" in *Dory Turnipseed v. APMT, LLC d/b/a/ Tonti Management, 2:18-cv-05187, U.S.D.C. E.D. La*. Respondent states that multiple legal principles preclude this complaint. It is a general denial of any wrongdoing. The objections to the complainer are on the basis of: lack of subject matter jurisdiction, prematurity, improper service of process, improper venue, lis pendens, and res judicata."

**Nature of Document: James Rather Email to EOS Walker (C3)**
Who Provided: Shirley Walker
How Transmitted to HUD: Email

Date of Document: April 16, 2019
Date Obtained: April 16, 2019

Rather's response to EOS Shirley Walker's email dated 04/15/2019 requesting an answer to the complaint. Attached is document HUD Response 7-112-18.docx. Rather's response states that: "On July 11, 2018, nine months ago, my client submitted the attached response to Ms. Turnipseed's HUD complaint. Please also note that, on June 18, 2018, Judge Henry Sullivan of the 24th Judicial District Court in Gretna, Louisiana evicted Ms. Turnipseed for lease violations. Her federal lawsuit against Tonti is still pending. As noted on our July letter, my client continues to reference all pleadings filed therein as responsive to Ms. Turnipseed's complaint.

**Nature of Document: 9Feb23 RP Answer to Data Request (C4)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: February 09, 2023
Date Obtained: February 09, 2023

This respondent evidence was submitted in response to a February 1, 2023 data request. In opening their response, RP attorney James Rather "objects" to answering a number of questions posed to his clients, alleging they are "duplicative and unduly burdensome" as Respondents claim to have submitted them in May of 2021.

Asked to provide Sunlake's community rules and policies in question one (1), RPs forwarded the Complainant's complete lease with several highlighted portions including the Animal Disclosure and Animal Lease Addendum. The document includes someone's script writing of "Initial" on the line of the first paragraph where one would indicate they do not have an animal but there are no initials on the line nor is Complainant's name written in. The second paragraph where one would indicate they do have an animal is left blank.

The document then states "Lessor hereby issues an Animal Lease to DORY TURNIPSEED, Apartment 854-23 at 854 JOE YENNI BLVD. APT 23. in KENNER, Louisiana, for the term commencing on 04/13/18 and is subject to the following terms and conditions:" The following nine (9) paragraphs outline Tonti's rules for animals on property and includes Complainant's signature at the bottom as Lessee.

Question two (2) asked Tonti to provide Complainant's tenant file and RPs submitted her application package which included credit reports, check stubs, checks, W-2s, and a security deposit receipt. The file also included a copy of the animal violation Complainant received on May 15, 2018 that levied a $1,050 fine, a typed letter dated May 14, 2018 from Complainant to RPs regarding the animal violation, email correspondence between RP Sherri Roane and Complainant, and Dr. Freidman's ESA Letter.

The May 14, 2018 typed letter titled "Notice I Received in My Door This Evening" is from Complainant to Kim Mamerto in response to the fine and reads:

"Ms. Kim Mamerto,

I currently in the process of getting the animal approved through a reasonable accommodation request.

The animal in question is an Emotional Support Animal, prescribed by my current LCSW Jeffery Friedman.

I spoke with Sherri Roane and a member of your legal team on Thursday May 10. At the end of the conversation I was told I would be contacted by someone to come fill out additional paperwork.

Due to an unforeseen decline in my mental stability, which I outlined in my email to Sherri Roane today I did move the dog in over the weekend. As I have explained to Ms. Roane, I am not attempting to circumvent your rules. I do suffer from mental disabilities which greatly affect my ability to function in day to day life.

Please see documents I have included with this letter which include: ESA Letter from Jeffery Friedman, LCSW, Contact information for Jeffery Friedman, LCSW, email correspondence with Sherri Roane.

Please see Ms. Roane for the additional documents proving that I have been treated by a psychiatrist since 2014.

As I have told Ms. Roane in my email. dated today: I am seeking legal advice, as I feel I have been unfairly treated in this matter.

"This answer also included the May 15, 2018 reasonable accommodation denial letter, a "speed message" informing Complainant about her eviction court date and $330 pro rated rent amount, Complainant's third request that RPs direct all future correspondence to her attorney, and a return of funds notice refunding Complainant's $660 rent payment in lieu of a prorated amount.

The last three items sent in response to question two (2) are a speed message asking Complainant to remove curtains hanging on her balcony, Complainant's June 9, 2018 response to this speed message informing RPs that she was unable to remove her curtains at the deadline due to her having been committed, and a July 11, 2018 balance sheet wherein Tonti was requesting $11,236 from Complainant for costs including an unreturned key, removal of excess trash, cost of eviction, and photos.

Respondents refused to provide, when asked in question three (3) a copy of Tonti's RA policy and other documents relating to their processing of tenants' RA and stated it was sent to FHEO on May 10, 2021.

Question four (4) of the data request asked RPs to provide the name and title of the Tonti employee responsible RE decisions between 2018-2020 along with the name and job title of the Tonti employee who denied Complainant's RA requests on May 15, and June 11 of 2018. RPs answered the employee responsible was Suzanne Tonti and RP counsel "objected" the classification of Complainant's June 11, 2018 RA decision as a denial. RP's counsel Rather wrote:

It was not denied. Complainant refused to permit my clients to verify the June 8, 2023 letter from Seaside Behavioral Center at St. Luke's, withdrawing from the interactive process. This was particularly curious since Complainant's counsel had encouraged my clients to verify the

letter written by Mr. Friedman, whose letter we have reason to believe was purchased in a transactional relationship rather than a therapeutic one. One questions why my clients would be encouraged to verify a letter purportedly written by an online provider suspected of selling ESA "prescriptions" for financial gain, yet prevented from verifying a letter purportedly written by a local mental health treatment facility.

Question five (5) of the data request asked RPs to furnish all written correspondence with Complainant to which the incorporated the response to question four (4).

Question six (6) asked RPs to provide the name and job title of the Tonti employee who decided to evict Complainant and they replied it was Suzanne Tonti.

Asked to furnish all correspondence between RPs and Complainant regarding her eviction in question seven (7), Rather incorporated the relevant portions of Complainant's tenant file from question two (2).

Question eight (8) asked RPs to provide a list of tenants evicted for violating the animal lease provisions between 2017 and 2020 to which Rather objected again writing the request was "duplicative and overly burdensome" because it was provided on May 10 and May 18 of 2018.

Question nine (9) asked RPs to provide a list of tenants who requested RA for ESAs between 2017 and 2020 and Rather incorporated RP's answer to question eight (8).

Question ten (10) asked RPs to provide the management or contractual agreement between Five Properties, the owner of Sunlake Apartments, and Tonti Management, property manager. Rather replied "Objection. This request seeks irrelevant information which is confidential and proprietary in nature."

Respondent Response to FHEO Data Request.

**Nature of Document: 23Mar23 RP Answer to Pre Subpoena (C5)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: March 23, 2023
Date Obtained: March 23, 2023

RP Response to pre-subpoena. RP provided none of the documents FHEO requested in response to the pre-subpoena. Responded Representative James Rather writes, in part:

"As I have pointed out in prior correspondence, I must once again object to the extent these requests are duplicative, irrelevant to the Turnipseed matter, and unduly burdensome. This is the now the fourth request for the same information, not counting the information my clients supplied to the former HUD Investigator, Ms. Karen R. Reckley, in numerous email communications in the fall of 2020. Of the five questions now being asked, four have been asked and answered by my clients' responses dated May 10, 2021, May 18, 2021 and again on February 9, 2023. It should also be noted that, after years of delay during the course of the

investigation through no fault of my clients, the events at issue occurred nearly five years ago. Respondent, APMT, LLC, has not managed or operated the property in quite some time, making it difficult to access certain information responsive to these requests…

…An issue we discussed following my clients' December 22, 2022 interviews also bears repeating. My clients had ample grounds to question Ms. Turnipseed's good faith with respect to her request for accommodation. There is reason to believe she obtained/purchased her May 5, 2018 letter from a therapist in Florida, Jeffrey Friedman. Mr. Friedman was not licensed in the State of Louisiana and it appears he did not have a legitimate therapeutic relationship with Ms. Turnipseed before writing the letter. Her attorney, Marcy LaHart, encouraged my clients to verify Mr. Friedman's illegitimate letter. However, she refused my clients' request to verify the second letter written by Dr. Mahoney on June 8, 2018. Why Ms. LaHart would encourage my clients to verify the illegitimate letter but not the other one she later insisted my clients blindly rely on raises other significant questions about Ms. Turnipseed's good faith. Regardless, by refusing my client's reasonable request to verify Dr Mahoney's letter and filing suit, Ms. Turnipseed withdrew from the interactive process.

> 'In Beck v.Univ. of Wis. Bd. of Regents, 75 F.3d 1130 (7th Cir. 1996), the Seventh Circuit held: [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary*** In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.'

Id. at p. 1135; see also, Bone v. The Village Club, Inc. 8:15-cv-579-T-36 (U.S.D.C. M.D. Florida 10/12/16).

Here, Ms. Turnipseed failed to participate in the process good faith by making no efforts whatsoever, much less reasonable efforts, to assist my clients in verifying the second letter. She and her attorney were the cause of the breakdown, not my clients. They withdrew from the interactive process by preventing my clients from verifying the second letter, when ironically, they encouraged my clients to verify the first, illegitimate letter written by a remote provider who was unlicensed in the State of Louisiana. If a Court is asked to isolate the cause of this breakdown for the purpose of assigning responsibility, there is compelling evidence Ms. Turnipseed and her counsel will be isolated as the sole cause of the breakdown of the interactive process."

**Nature of Document: RP Fair Housing Statement (C6)**
Who Provided: Rather, Jr., James
How Transmitted to HUD:
Date of Document: May 10, 2021
Date Obtained: April 17, 2023

Response to a data request presumably sent by former FHEO Investigator Kimberly Parker to RPs. Documents are a fair housing statement and a memo with a list of tenants from 2020 to the date of the document who were fined for unauthorized animals.

The Fair Housing Statement reads:

Tonti Management complies with the letter and spirit of all State and Federal Fair Housing laws. Tonti Management respects the diversity and differences of our applicants and residents by providing equal housing services to all without regard to race, color, religion, sex, handicap, familial status, national origin or other protected classes.

Tonti Management is committed to keeping informed about State and Federal Fair Housing laws and practices. No qualified person will be denied housing or otherwise discouraged from obtaining housing at Tonti Management properties because of his/her protected status under State or Federal law.

No qualified individual with disabilities or handicaps will be excluded solely on the basis of their disabilities or handicaps from enjoying the full benefits of housing offered by Tonti Management. As required by law, Tonti Management will provide reasonable modifications and/or accommodations to all qualifying applicants and residents who need such modifications and/or accommodations to be able to enjoy the benefits of housing.

Requests for modification/accommodation must be in writing and, unless the need is obvious, accompanied by verification from a doctor, healthcare professional, or other qualified third party who has a therapeutic relationship with the resident or applicant and who, in their professional capacity, has knowledge about the person's handicap or disability and the disability-related need for the modification/accommodation. When additional information is necessary, Tonti Management will notify the person seeking the modification/accommodation. If, after a reasonable period of time, the individual fails to provide the necessary information, Tonti Management may base the decision on the available information.

Tonti Management adheres to State law, Federal law and H.U.D. regulations and guidance on authorizing assistance animals for disabled or handicapped applicants and/or residents. Tonti Management will evaluate each request in accordance with the law on a case by case basis and in a timely and professional manner.

**Nature of Document: 10May21 RP Answer to Data Request (C7)**
Who Provided: Rather, Jr., James
How Transmitted to HUD:
Date of Document: May 10, 2021
Date Obtained: April 17, 2023

Response to a data request sent by FHEO Investigator Kimberly Parker to RPs. Documents are a fair housing statement and a memo with a list of tenants from 2020 to the date of the document who were fined for unauthorized animals.

EOS Parker requested a reasonable accommodation policy for RPs and Rather responded his clients do "not have a document by that name" and instead forwarded a document titled "Fair Housing Statement." Relevant parts state:

No qualified individual with disabilities or handicaps will be excluded solely on the basis of their disabilities or handicaps from enjoying the full benefits of housing offered by Tonti Management. As required by law, Tonti Management will provide reasonable modifications and/or accommodations to all qualifying applicants and residents who need such modifications and/or accommodations to be able to enjoy the benefits of housing.

Requests for modification/accommodation must be in writing and, unless the need is obvious, accompanied by verification from a doctor, healthcare professional, or other qualified third party who has a therapeutic relationship with the resident or applicant and who, in their professional capacity, has knowledge about the person's handicap or disability and the disability-related need for the modification/accommodation. When additional information is necessary, Tonti Management will notify the person seeking the modification/accommodation. If, after a reasonable period of time, the individual fails to provide the necessary information, Tonti Management may base the decision on the available information.

EOS Parker asked RPs for a list of tenants fined and/or evicted for unauthorized animals between 2018-2020 and Rather replied Tonti "only has access to files from 2020 forward of residents still living at its property.

**Nature of Document: 18May21 RP Answer to Supp Data Request (C8)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: May 18, 2021
Date Obtained: April 17, 2023

A document showing ledgers for other Tonti tenants fined and/or evicted for having unauthorized pets. Time frame is 2020 however, and not during the time Complainant was being evicted by RPs. Document forwarded in response to a supplement to an undated data request by former FHEO investigator Kimberly Parker.

EOS Parker sought clarification about whether Tonti has no records for unauthorized animal evictions prior to 2020 or if they just did not have access to said records. Rather replied "My client does not have access to those records. My client is only able to search physical records of current leaseholders, and for past leaseholders, only records for the current year and the prior year. Past leaseholders' physical records for prior years are not maintained and there are no computer fields or keywords that can be searched for "evictions" or similar terms.

EOS Parker's next question surrounds further information about the previously identified residents cited for unauthorized animals and whether any of them requested an ESA RA before or after Tonti discovered the animal on property. Rather replied that two (2) of the four (4) tenants provided had in fact attempted to obtain an RA.

Regarding the tenant in apartment 858-16 Rather wrote

Yes. The animal was discovered in the apartment before the resident made an ESA request. My client understands it was her grandmother's animal, and her grandmother had passed away. Once my client discovered it in the apartment, the resident admitted it had been living there for two months. The resident entered into a payment agreement to pay charges related to the animal. After making two payments, she obtained a letter allegedly prescribing the animal as an ESA. My client did not accept the request based upon the information submitted because it had been purchased online from an unreliable source who did not have an ongoing therapeutic relationship with the resident. Thereafter, the resident continued making payments, complied with the original agreement, was allowed to keep the animal and was not evicted.

As an aside, it should be noted that, in our industry, this is becoming a common occurrence. Residents acquire pets and bring them into apartments without obtaining the landlords' prior approval. Once the animal is discovered, and in order to avoid the fees and penalties they contractually obligated themselves to pay, the animal that was once a pet becomes an ESA after the residents visit a website selling unreliable ESA letters. That appears to have happened in Ms. Martin's situation."

Of the other relevant tenant in apartment 864-25 Rather wrote:

"Yes, the resident called on January 17, 2020 asking how to get an ESA approved. My client explained the process, noting that it does not accept letters purchased online from providers with whom the resident does not have an ongoing therapeutic relationship. The resident called back on January 23, 2020 asking how to get a "pet" approved. Not an ESA, a pet. My client explained this apartment has new carpet and she could not bring a pet into the apartment without paying additional security deposits and animal fees. The following day, the resident called back stating she obtained an ESA letter. She admitted she purchased it online and did not have any therapeutic relationship with the provider. For this reason, my client did not accept the request. Thereafter, on January 27, 2020, the resident executed an animal addendum. She paid all animal fees that day, and the animal deposit on March 1, 2020. She was allowed to keep the animal and was not evicted."

EOS Parker then asked for information about fines assessed, timeframes to pay, whether the resident paid the fines, documentation of these payments, and what actions were taken against those who did not pay the fines. Rather referred EOS Parker to attachments on his email with the requested information.

EOS Parker's final question asked if tenants who paid the fine were able to keep the animal and Rather replied "Yes."

**Nature of Document: Respondent Data Request Extension Request (C9)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: February 02, 2023
Date Obtained:

RP Atty Request for an extension to provide a response to the data request.

**Nature of Document: 9Feb23 RP Answer to Data Request (C13)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: March 30 2018
Date Obtained: February 09, 2023

Complainant's full lease with the "Animal Disclosure and Animal Lease Addendum" included.

**Nature of Document: J Rather Case Closure Request (C14)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: February 14, 2023
Date Obtained: February 14, 2023

RP attorney James Rather emailed a court order dismissing Complainant's claims with prejudice asserting their ongoing cooperation with the investigation but questioned why the investigation was still open due to the court's order.

Rather's email reads:

Attached is an Order from the U.S. 5th Circuit Court of Appeals dismissing Ms. Turnipseed's appeal. As such, the trial court's dismissal of her case and her claims with prejudice is now a final judgment. You previously indicated your office is only pursuing relief on her behalf, and not on the Secretary's behalf. In light of the foregoing, any claims or causes of ac on Ms. Turnipseed may have had arising out of her tenancy at my client's apartment community are barred by *res judicata*. Therefore, we would respectfully request closure of this investigation.

**Nature of Document: J Rather Investigation Validity Question (C15)**
Who Provided: Rather, Jr., James
How Transmitted to HUD: Email
Date of Document: March 13, 2023
Date Obtained: December 09, 2022

RP attorney James Rather emailed a court order dismissing Complainant's claims with prejudice asserting their ongoing cooperation with the investigation but questioned why the investigation was still open due to the court's order.

Rather's email reads:

My client is willing to cooperate with HUD's investigation. However, in the a ached Order, a federal Judge dismissed Ms. Turnipseed's claims with prejudice. When we last spoke, either you or one of your colleagues indicated HUD initiated this investigated solely to vindicate Ms. Turnipseed's rights, and not the Secretary's. Because Ms. Turnipseed's claims have been dismissed with prejudice and the Secretary's rights are not at issue, we ques on the purpose of

continuing the investigation. Again, my client is not refusing to cooperate. We are simply raising this issue in light of the federal Court's recent Order.

Thank you for considering the above information. We look forward to hearing from you.

**Nature of Document: 28Aug-9Sep2020 Request for Information Emails (C16)**
Who Provided: FHEO
How Transmitted to HUD: Online
Date of Document: September 9, 2018
Date Obtained: October 31, 2023

Email exchange between EOS Karen Reckley and RP attorney James Rather between August 28, 2020 and September 9, 2020. EOS Reckley emails Rather on August 28 to inquire about whether he is still representing respondents Five Properties and Tonti management in the complaint. Rather replies same day that he is still representing respondents.

EOS Reckley then asks:

"Please advise if you or your clients were ever presented with the attached Doctor's letter? Also, what attempts, if any, did you or your clients make to collect on the attached Final Notice to pay?
In addition, provide a copy of the eviction packet that was filed for the eviction proceeding."

Attached to the email is the referenced ESA letter from Dr. Mike Mahony. A second email immediately follows that one where EOS Reckley forwards the "Final Notice to Pay" accidentally omitted from the previous email.

EOS Reckley received no response from Rather and reached back out 6 days later, September 3, 2020, on the same email thread requesting an answer to the questions from her previous letter.

On September 4, 2020, Rather replied, "I have sent your inquiries to my client and will respond as soon as possible."

On September 9, 2020, Rather provided the following responses from his clients:

1. Yes. On June 11, 2018, my client received Dr. Mahoney's June 8, 2018 letter. As reflected in the attached, the eviction was filed on May 23, 2018, and was heard and granted on June 18, 2018.

2. The entirety of my client's collection efforts can be summarized as follows. They followed their standard operating procedures with respect to Ms. Turnipseed. She was sent a standard 30-day moveout form reflecting charges. Thereafter, she was sent two notices. The one attached to your 9/3/20 email is the second notice. No other notices have been sent to Ms. Turnipseed that we are aware of.

3. I am not familiar with an eviction packet. But attached are the eviction pleadings my client filed on May 23, 2018. I am also attaching the Judgment of Eviction.

The attachments Rather included are:

1. Petition for Eviction stamped as filed via fax on May 23, 2018 at 10:52 AM. The petition has the original show cause hearing date set for June 13, 2018 at 9:00 AM. The order was signed by Judge Henry Sullivan on May 24, 2018.

2. Document labeled Exhibit A is Complainant's lease including a completed guest visit form, photo I.D. verification form, completed apartment application, and a copy of the complainant's 38 age lease.

3. Judgment of eviction issued June 28, 2018 and signed by Colinda H Quarrella. The judgment states that on June 18, 2018 an eviction hearing was held and attended by Complainant's then-attorney Sherri Hutton and Rather after which the latter was granted a petition for eviction with Complainant's vacate date set to June 25, 2018. The Judgment is signed and dated for June 26, 2018.

**Nature of Document: Nov2023 RA Policy Inquiry to RP (C17)**
Who Provided: VanHook, Chanel
How Transmitted to HUD: Email
Date of Document: November 22, 2023
Date Obtained: November 22, 2023

Email exchange between EOS Chanel VanHook and RP Representative James Rather about the date of Tonti Managements provided "Fair Housing Statement." EOS VanHook asked RPs to provide the effective date of the policy and Rather replied, in part, "My client advises this policy has been in effect for many years. Other than the foregoing, my client is unable to identify the month, date and year it took effect."

In response, EOS VanHook asked Rather to have RPs confirm whether the policy was in effect during Complainant's tenancy. Rather replied "In response to your below question, as it has been over 5 years since Ms. Turnispeed lived at my client's property, my client is unable to definitively state whether this exact policy was in effect during her tenancy."

**Nature of Document: RP's Motion to Compel Arbitration and Stay (D1)**
Who Provided: HUD OGC
How Transmitted to HUD: Pacer
Date of Document: July 05, 2018
Date Obtained: September 17, 2019

Respondents' Motion to Compel Arbitration and Stay Proceedings filed in federal court. The motion states that the Complainant's arbitration clause is binding in this scenario. Attached as an exhibit is the arbitration agreement that Complainant signed.

The arbitration agreement stipulates that, except for paragraph C, the Lessor and Lessee agree to binding arbitration for "any and all claims between the parties for liability, personal injury or illness damages, property damages, or expenses arising out of, relating to, or in connection with the lease, the occupancy of the premises, including any and all warranties (including but not limited to warranties imposed by Louisiana laws, statutes or regulations), representations, or agreements relating thereto, as well as any disputes, claims or controversies regarding the scope, validity and/or enforceability of this Arbitration Agreement, It then quantifies the clause as binding if the claim is for an amount in excess of $2,500.

Paragraph C reads, in part, that "any dispute, claim, or controversy with a value of $2,500 or less arising out the Lease and all addenda thereto, including but not limited to claims for eviction…Lessor and Lessee hereby agree to waive their right to demand arbitration and, instead, agree to litigate and/or resolve the dispute ,claim, or controversy in the Justice of the Peace Court."

**Nature of Document: CP Response in Opposition to Compel Arbitration (D2)**
Who Provided: HUD OGC
How Transmitted to HUD: Pacer
Date of Document: July 24, 2018
Date Obtained: September 17, 2019

Supplemental Memorandum in Opposition to Emergency Motion for Temporary Restraining Order and Preliminary Injunction filed by Complainants. Complainant's attorneys claim Tonti sought "to compel arbitration of [her] claims that her eviction constituted disability discrimination" in violation of the Fair Housing Act. Complainant attorneys further states the Federal Arbitration Act (FAA) does not apply to residential leases and that the lease in this case and that the arbitration clause is adhesive and unconscionable.

Complainant's attorney also argues that "This attempt to avoid fee-shifting is contrary to Congress's well established policy of encouraging private enforcement of the fair housing act." She elaborates the attempted avoidance is contrary to fee-shifting's purpose relating to the Act which she asserts was provided "to make it easier for a plaintiff of limited means to bring a meritorious suit, by offering some incentive for attorneys to take such cases."

Closing out their argument, Complainant's attorney's write "Turnipseed cannot afford to pay an attorney to litigate her case, and no experienced fair housing lawyer would represent a discrimination victim of limited means in an individual arbitration under the terms unilaterally imposed by Tonti. Upholding the arbitration clause would vitiate the fair housing rights of Plaintiff and any other disabled resident of any community managed by Tonti as they could not afford to enforce them."

**Nature of Document: Supplemental Memo Opposing TRO (D3)**
Who Provided: HUD OGC
How Transmitted to HUD: Pacer
Date of Document: June 11, 2018
Date Obtained: September 17, 2019

A memorandum from Respondents in opposition to the May 23, 2018 temporary restraining order filed by Complainants in Federal Court. Respondents argue the argument for a restraining order is weak and that the Complainant's attorney wrote it with a "caustic tone and ad hominem personal attacks against counsel." Furthermore, the Respondent argues that the Anti-Injunction Act (AIA) bars injunction of state court eviction proceedings and that on the merits of the case, injunctive relief is not appropriate, and that the arbitration clause is enforceable.

Respondents asserts Complainant did not meet the definition of having a disability or handicap under the act. The Act defines handicap as a person with "a physical of mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. RPs refute claims it did not engage in the interactive process instead saying Complainant withdrew "by immediately lawyering up, threating litigation, and barring communications with anyone other than her attorney."

Exhibits Respondents submitted in the filing include some of the documents Complainant included as documentation for her RA request. Among them are three (3) years' worth of After Visit Summaries from the Ochsner Psychiatry Resident Program between 2015-2018. The summaries detail her ongoing treatment for generalized anxiety disorder (GAD), attention deficit hyperactivity disorder (ADHD), and shift work sleep disorder.

Also included is email traffic between Complainant and Respondent Sherri Roane on May 18, 2018. At 10:21 AM Roane emails Complainant with a "final inquiry" into any further documentation she intends to submit in support of her RA and that the information should be sent no later than "May 21, 2018 at noon." She closes that should they not receive anything by the deadline, Tonti will assume she doesn't intend to submit any further information or pay the $1,050 fine from the unauthorized animal violation. At 10:24 Complainant replies that she is forwarding the email to her attorney. At 10:32 Complainant replies again to Roane requesting that she "direct all correspondence to my attorney Marcy Lahart."

Approximately two (2) hours later at 12:36 PM on May 18, 2018, Roane replied to Complainant's emails with an offer for her to terminate her lease within 48 hours if she felt "that would be in her best interest." The offer was accompanied by an Intent to Vacate form and the offer that Tonti would waive any notice or cancellation fees. Roane's email reads:

"We would like to extend you the offer for you to termite [sic] your lease with a 48-hour notice if you feel like that would be in your best interest.

I have attached the Intent to Vacate form should you wish to use it. Tonti will waive any notice fees or cancellation fees.

Please provide 48 hours notice if you wish to avail yourself of this option."

The last page of the exhibit is a memorandum from Complainant to Tonti regarding a notice that was left on her door May 28, 2018. In the memo Complainant stresses that it is "the THIRD time" (emphasis in original) she has requested Tonti not to contact her directly and to forward all correspondence to her attorneys.

**Nature of Document: Order Granting Motion to Compel Arbitration (D4)**
Who Provided: HUD OGC
How Transmitted to HUD: Pacer
Date of Document: November 14, 2018
Date Obtained: September 17, 2019

Order granting Respondents' Motion to Compel Arbitration. The Federal Judge granted the motion to compel arbitration between the Complainant and the Respondent for the fair housing discrimination case. The Court states that the FAA is applicable, the agreement to arbitrate is enforceable under state law and no federal law or policy prohibits arbitration.

**Nature of Document: Order Denying TRO (D5)**
Who Provided: HUD OGC
How Transmitted to HUD: Pacer
Date of Document: June 13, 2018
Date Obtained: September 17, 2019

Order denying Complaint's Motion from Preliminary Injunction. The Federal Court states that the injunction sought is barred by the Anti Injunction Act. The order denying the injunction was signed on June 13, 2018.

**Nature of Document: 15Mar23 Pre Subpoena Letter (D6)**
Who Provided: VanHook, Chanel
How Transmitted to HUD:
Date of Document: March 15, 2023
Date Obtained: March 15, 2023

Pre subpoena letter requesting answers to questions previously refused to answer and documents they also declined to furnish.

**Nature of Document: Data Request (D7)**
Who Provided: Chanel VanHook
How Transmitted to HUD: Online
Date of Document: February 01, 2023
Date Obtained: February 01, 2023

A data request prepared by EOS Chanel VanHook and signed by Fort Worth Regional Office Center Director Patrick Banis that was sent to Respondent's on February 1, 2023. FHEO requested answers to or documents speaking to the following:

1. Provide a copy of Sunlake Apartment's community rules and policies including documents from Tonti Management governing the issuance of lease violations, non-renewals, and evictions for the years 2018 through 2019.

2. Provide a copy of Complainant's complete tenant file during her tenancy at Sunlake Apartments, including, but not limited to: the signed lease, any lease violations, payment history,

and records of contact or correspondence between all Tonti Management personnel and Complainant.

3. Provide a copy of Tonti Management's reasonable accommodation policy including documents governing the process to requesting, approving, and denying reasonable accommodation requests for emotional support animals.

4. Provide the full name, job title, and contact details for the Tonti Management employee(s) responsible for receiving and considering reasonable accommodation requests between the years 2018 and 2020. Additionally, provide the full name, job title, and contact details for the Tonti Management employee(s) who made the decision to deny Complainant's reasonable accommodation requests made on May 15, 2018 and on June 11, 2018, respectively.

5. Furnish all written correspondence with Complainant regarding the denial of her reasonable accommodation requests.

6. Provide the full name, job title, and contact details for the Tonti Management employee(s) responsible for considering and making the decision to initiate eviction proceedings against the Complainant.

7. Furnish all written correspondence with Complainant regarding her eviction.

8. Provide a list of tenants who have been evicted for violation of the animal addendum or animal lease provisions between the years 2017 and 2020.

9. Provide a list of tenants at Sunlake Apartments who have requested reasonable accommodations for emotional support animals between the years 2017 and 2020. Within this list, indicate which tenants were granted reasonable accommodations and which were not.

10. Provide a copy of the management agreement or the document identifying the contractual business relationship between Five Properties and Tonti Management.

**Nature of Document: 9Dec22 RP USDC EDLA Motion to Dismiss (D8)**
Who Provided: FHEO
How Transmitted to HUD: PACER
Date of Document:
Date Obtained: August 10, 2023

Respondent motion to dismiss for failure to prosecute and initiate arbitration Complainant's civil suit against Tonti Management. Judge Carl J. Barbier deemed the suit unopposed and dismissed it with prejudice on December 9, 2022.

**Nature of Document: 9Jan23 CP USDC EDLA Appeal of 9Dec22 Motion (D9)**
Who Provided: FHEO
How Transmitted to HUD: PACER

Date of Document: January 09, 2023
Date Obtained: August 10, 2023

Complainant attorney Marcy LaHart motion to appeal Judge Barbier's November 13, 2018, motion to compel arbitration and December 9, 2023 dismissal with prejudice order.

**Nature of Document: 13Feb23 5th Cir. Voluntary Dismissal (D10)**
Who Provided: FHEO
How Transmitted to HUD: PACER
Date of Document: February 13, 2023
Date Obtained: August 10, 2023

Fifth Circuit Joint stipulation of Complainant and Respondent agreeing to withdraw Complainants January 9, 2023, appeal.

**Nature of Document: 14Feb23 5th Cir. Dimissal Order (D11)**
Who Provided: FHEO
How Transmitted to HUD: PACER
Date of Document: February 14, 2023
Date Obtained: August 10, 2023

February 14, 2023 motion to dismiss pursuant to the February 13, 2023 joint stipulation to dismiss by both parties. Order is signed by Deputy Clerk Marjella A. Sutton.

**Nature of Document: BMC Medical Informatics and Decision Making Journal Article (D14)**
Who Provided: Banis, Patrick
How Transmitted to HUD: Internet
Date of Document: May 16, 2023
Date Obtained: September 11, 2024

*BMC Medical Informatics and Decision Making* journal article excerpts highlighting the benefits of telemedicine and telehealth services while also noting the accessibility drawbacks elderly and rural populations may face. The article, *The tragic paradoxical effect of telemedicine on healthcare disparities- a time for redemption: a narrative review*, was authored by Dr Motti Haimi, MD, PhD, MHA and published on National Institutes of Health's online National Library of Medicine site.

Motti writes, in relevant parts:

> *Telehealth uses communication technologies to exchange information and deliver healthcare services by healthcare professionals, where the participants are separated by geographical distance. By providing health services at a distance, telemedicine enables providers and patients to overcome geographic and other barriers to medical care.*

Telemedicine has developed in recent years into a practical and secure method for people to get medical advice and information about their health. The quick advancement of internet and communications technology has sped up this trend.

Telemedicine…enables medical practitioners to increase the scope of their direct and urgent medical support services. It enables access to healthcare anywhere there is a communications network. Given that it meets patient requirements and preferences in a way that in-person clinical appointments cannot, it is probable that telemedicine will continue to play a significant role in the delivery of healthcare.

There are many benefits in using telehealth, especially in non-emergency everyday care and in cases where services do not involve direct patient-healthcare supplier contact. In addition to its main benefit in promoting ease of access to distant health services, telehealth can also help address disparities in access to healthcare facilities and improve health outcomes…Telemedicine offers the opportunity to provide clinical services at a distance, thereby solving geographic and additional obstacles to medical care. It enables providers to offer immediate medical support, making healthcare more accessible and efficient in any location that has a telecommunications infrastructure.

By reducing the need to travel for medical care, telemedicine improves healthcare efficiency and accessibility. It makes it possible to use a range of communication techniques, including video, writing communication, and online translation. Additionally, it has been demonstrated to enhance patient outcomes.

Better long-term care management has also been demonstrated to be made possible by the use of telemedicine. Additionally, it provides a fresh and new way to communicate with medical professionals and find out about health issues.

In a number of ways, telehealth improves patient satisfaction. Better access to care is its primary benefit. By eliminating the need to travel and miss work, it also lessens stress. These elements also translate to greater patient convenience.

Telehealth technologies are increasingly being adopted and applied as an efficient and cost-effective means for providing and gaining access to quality health care services. These services are becoming an appealing tool to use worldwide.

By using telehealth, clinicians can extend their reach, connecting to remote patients, and usually are able to manage more patients than traditional care models would typically allow. With the increased access achieved by telemedicine, both physicians and patients can collaborate in attaining their therapeutic objectives, especially in home and hospice care settings. The use of telemedicine also has the capability to assist patients become more engaged in their healthcare strategy, increase their independence and compliance.

By improving access to healthcare in underserved areas, telemedicine improves access to care for all patients, regardless of their location. Telehealth has made it possible to offer services in specialized domains, in particular. A wide range of specialties, including

*dermatology, cardiology, pediatrics, psychiatry, neonatology, and neurology (stroke),
now provide telemedicine possibilities.*

**Nature of Document: Journal of General Internal Medicine Article on Telemedicine (D15)**
Who Provided: Banis, Patrick
How Transmitted to HUD: Internet
Date of Document: August 22, 2007
Date Obtained: September 11, 2024

*Journal of General Internal Medicine* journal article summarizing a study conducted on the
benefits of telemedicine for persons suffering from depression. The article, *A Randomized Trial
of Telemedicine-based Collaborative Care for Depression*, was authored by John C. Fortney,
PhD; Jeffrey M. Pyne, MD; Mark J. Edlund, MD, PhD; David K. Williams, PhD; Dean E.
Robinson, MD; Dinesh Mittal, MD; and Kathy L. Henderson, MD. It was published on the
National Institute of Health's online National Library of Medicine site.

The physicians' report states the following:

> *The chronic care model for depression, known as collaborative care, improves
> depression treatment outcomes in primary care (PC) settings1–12 in a cost-effective
> manner. The chronic care model uses patient self-management, delivery system redesign,
> decision support, and clinical information systems to maximize the effectiveness of
> interactions between informed activated patients and prepared, proactive care teams.
> Practice-based collaborative care involves primary care providers (P* Complainant *s)
> working with an on-site depression care team comprising nonphysicians (e.g., nurses,
> pharmacists) and mental health specialists (e.g., psychiatrists).*
> *The underlying problems of treating depression are similar in rural or other isolated
> practices and larger urban practices. However, the solutions are not necessarily the
> same because evidence-based practices designed for large urban practices may not be
> portable into smaller practices where it is typically not feasible to employ mental health
> specialists on site. Only 25% of PC practices nationwide have on-site mental health
> specialists. Unless collaborative care models can be successfully adapted for small
> practices without on-site mental health specialists, patients treated in these settings will
> not benefit from dissemination efforts.*
>
> *The Institute of Medicine Defines telemedicine as "the use of electronic information and
> communications technologies to provide and support health care when distance
> separates the participants." The purpose of the Telemedicine Enhanced Antidepressant
> Management (TEAM) study was to adapt the collaborative care model for small PC
> practices without on-site psychiatrists. Telemedicine technologies (e.g., telephone,
> interactive video, electronic medical records, and internet) were used to facilitate
> communication between a centrally located off-site depression care team and P*
> Complainant *s practicing in geographically diverse clinic locations. We chose to conduct
> this first telemedicine-based collaborative care trial in the Veterans Administration (VA)
> because of the widespread use of interactive video technology and electronic medical
> records. VA treats about one-half million veterans for depression annually and delivers*

*higher quality depression care than private practices. We hypothesized that telemedicine-based collaborative care would improve antidepressant prescribing, medication adherence, depression outcomes, health status, quality of life, and satisfaction.*

*Our primary finding is that telemedicine technologies can be used successfully to adapt the collaborative care model for implementation in small PC clinics lacking on-site psychiatrists. The TEAM intervention significantly improved medication adherence, depression severity, mental health status, health-related quality of life, and satisfaction. Our telemedicine-based collaborative care intervention had similar effect sizes compared to practice-based collaborative care interventions included in a recent meta analysis. The intervention's impact on response (intermediate treatment goal) narrowed over time, whereas the impact on remission (ultimate treatment goal) increased over time. This suggests that symptoms improved more rapidly in the intervention group compared to the usual care group. By 6 months, this increased rate of symptom improvement led to a significant difference in response rates, although the difference in remission rates was not yet statistically detectable. By 12 months, this increased rate of symptom improvement resulted in a significant difference in remission rates, whereas usual care patients caught up to intervention patients in terms of response.*

**Nature of Document: Jeffrey Friedman Follow Up Emails (D16)**
Who Provided: VanHook, Chanel
How Transmitted to HUD: Email
Date of Document: November 18, 2024
Date Obtained: November 13, 2024

Emails between FHEO Investigator Chanel VanHook and Jeffrey Friedman regarding follow up questions to his second set of interrogatories.

On October 21, 2024, EOS VanHook wrote, in part:

I have a quick follow up question about the ESA letter you issued Dory. The records you sent show your first contact with her was May 5th, however, the letter, attached for your convenience, states you assessed her April 23rd.

Understanding this may be an oversight on what may be a form letter, can you please provide me a sentence or two explaining how or why it's dated as such no later than Thursday, October, 24, 2024? If you're not sure why it's dated April 23rd, a sentence or two explaining that will also suffice.

On October 22, 2024 Friedman replied:

*I wrote that I evaluated her on April 23rd because the client was in a difficult situation and I thought I t [sic] was more likely for her to get the accommodation approved if it was dated this way.*

On November 13, 2024 EOS VanHook replied:

Understood. Thank you for clarifying that!

To confirm: though it was backdated, the information contained in the letter regarding your opinion on her conditions and symptoms were still applicable in your recommending her assistance animal?

On November 13, 2024 Friedman replied:

> *Yes, that is correct.*

C. Interrogatories

**First Interrogatory Sent To: Jeffrey Friedman (D12)**
Interrogatory Sent Date: May 01, 2024
Interrogatory Returned Date: May 16, 2024

**INTERROGATORY 1: For the period of April and June 2018, provide a detailed recounting of your new patient evaluation process.**
My new evaluation process starts with a phone call and a biopsychosocial interview.

**INTERROGATORY 2: For the period of April and June 2018, provide a detailed recounting of your patient evaluation process as it relates to prescribing assistance animals.**
I would interview a patient's history and see if they met the disability criteria as it relates to the Fair Housing Act.

**INTERROGATORY 3: Provide a detailed recounting of how Dory Turnipseed initially contacted you for help with an assistance animal in 2018.**
Dory initially connected me through a service that matches up clients with mental health telehealth providers.

**INTERROGATORY 4: How many times did you meet with Dory Turnipseed before you agreed to write her letter supporting a need for an assistance animal?**
I met with Dory once through a phone call and after our interview that she meets the criteria to be permitted to have her emotional support animal in her residence as a disability-related accommodation.

**INTERROGATORY 5: Describe what you evaluated to determine that Dory Turnipseed had a disability-related need for an assistance animal. Did you evaluate any previous medical history? If yes, please explain.**
I evaluated Dory through a diagnostic interview and using her own detailed written report about her life and her mental health history.

**INTERROGATORY 6: Please identify the major life activities impacted/impaired by Dory Turnipseed's conditions.**

The major life activities that are affected by her disability are sleep and concentration that impact her ability to work and perform her job duties.

**INTERROGATORY 7: Please describe in detail how Dory Turnipseed's condition(s) affected her life activities (e.g., interferes with work, socializing, sleep, eating, etc.).**

**INTERROGATORY 8: For each affected life activity, please identify whether the symptomatology of Dory Turnipseed's condition(s) is occasional, frequent, or chronic?**
The sleep disturbance is chronic and the disruption of her attention is also chronic.

**INTERROGATORY 9: What symptoms of Dory Turnipseed's conditions would an assistance animal (dog) ameliorate?**
The assistance dog would help to ameliorate the hypervigilance Dory has associated with PTSD.

**INTERROGATORY 10: How does the ameliorative effects of an assistance animal help Dory Turnipseed overcome her functional limitations?**
The animal is a noninvasive intervention that helps Dory soothe and regulate her mood. The animal helps her to manage her mood and ground her in the present moment. Also, the animal helps her to keep a routine that functions to combat some of the anhedonia associated with mood disorders.

REQUESTS FOR PRODUCTION

**REQUEST 1: Provide any and all email communication from Dory Turnipseed requesting help for an assistance animal.**
Please see the attached documents and please pardon the spelling error.

**REQUEST 2: Provide a copy of any written questionnaires and paperwork Dory Turnipseed was required to complete as a new patient in 2018.**
There were no written questionnaires given to Dory.

**REQUEST 3: Provide any and all documentation Dory Turnipseed submitted accompanying her request for help with an assistance animal (e.g., previous medical history).**
--
Separate document responsive to Request 1 for Production
Dory Turnipseed
Sun, May 6, 2018, 7:15 PM
My only questions at this time are: Since you practice in Florida, will this be valid in Louisiana? Also, I was under the impression that only medical practitionars

Jeffrey Friedman
Sun, May 6, 2018, 7:21 PM
Hello Dory, Yes, good questions. No mental health professionals can write them as well. Ideally, you would get someone from Louisiana to write. The law the fair housing act is a federal law the allows ESA to live with you.

Dory Turnipseed
Sun, May 6, 2018, 7:26 PM
Thank you for your reply. I do not know why my current psychiatrist could not write the letter.
My only guess is that it has to do with his residency program.

Jeffrey Friedman
Sun, May 6, 2018, 7:42 PM
You are welcome.

Dory Turnipseed
Mon, May 7, 2018, 4:44 PM
One final question. They may want to call you and the phone number is not on the letter. Should
I just give it to them separately?

Jeffrey Friedman
Mon, May 7, 2018, 5:01 PM
Dory I prefer if they emailed any questions they have.

Dory Turnipseed
Thu, May 10, 2018, 4:24 PM
I spoke with the property owner/manager and they had me speak with a legal representative and
they are going to give me additional forms to fill out. One for me

Jeffrey Friedman
Thu, May 10, 2018, 4:25 PM
Yes, that would be fine.

Dory Turnipseed
Thu, May 10, 2018, 4:30 PM
Thank you so much. I will be in touch

Jeffrey FriedmanThu, May 10, 2018, 5:59 PM
Hello Dory, Could we set up at a time to have a video conference? Here is a link where I conduct
them https://doxy.me/sofa .

Dory Turnipseed
Thu, May 10, 2018, 6:11 PM
Yes absolutely.

Dory Turnipseed
Thu, May 10, 2018, 6:11 PM
I would be available tomorrow after 3pm. Or any time Saturday or sunday

Dory Turnipseed < ███████████ >
Attachments

Fri, May 11, 2018, 9:28 AM
to me
I wrote out a brief history of myself and my dealings with psychiatric disorders
last night after I gave up trying to fall asleep.
It may help narrow down or clarify your questions when we speak.
Thank you.

**Second Interrogatory Sent To: Jeffrey Friedman (D13)**
Interrogatory Sent Date: August 15, 2024
Interrogatory Returned Date: August 29, 2024

**REQUESTED:**

INTERROGATORIES
INTERROGATORY 1: Identify the first date of contact with Complainant Dory Turnipseed and the method of that contact (i.e. email, phone, website portal, etc.).
INTERROGATORY 2: Identify the service that was used to match you with Complainant Dory Turnipseed.
INTERROGATORY 3: Identify in chronological order all dates you met with or spoke to Complainant Dory Turnipseed either by phone call and video conference call and describe in detail the purpose of each meeting.

REQUESTS FOR PRODUCTION
REQUEST 1: Provide, in their original form and/or context, all written communication between yourself and Complainant Dory Turnipseed from 2018. (i.e., from a screenshot, print screen function, Gmail print option, etc.)

**RECEIVED:**

**INTERROGATORY 1: Identify the first date of contact with Complainant Dory Turnipseed**
**and the method of that contact (i.e. email, phone, website portal, etc.).**

**ANSWER:**

My first contact with Dory Turnipseed was via email on May 5, 2018. Ms. Turnipseed emailed me her contact information after I was assigned to evaluate her and determine if she needed an emotional support animal to alleviate the symptoms of a disability.

**INTERROGATORY 2: Identify the service that was used to match you with Complainant Dory**
**Turnipseed.**

**ANSWER:**

USAservicedogs.org

**INTERROGATORY 3: Identify in chronological order all dates you met with or spoke to Complainant Dory Turnipseed either by phone call and video conference call and describe in**
**detail the purpose of each meeting.**

ANSWER:

I spoke with Dory on May 6, 2018 in order to interview her regarding her mental health history and evaluate her current condition. Dory shared her history of serious mental health problems including depression and anxiety with panic attacks. At the time of our initial phone consultation she was experiencing overwhelming anxiety and depression. Dory was having frequent crying spells and obsessive thoughts regarding a friend's suicide as well as reliving traumas she had experienced as an EMT. Even though she was taking medication as prescribed by her psychiatrist her symptoms were so severe that she was unable to function normally. She indicated that visiting her dog Sasha at her parent's home was the only thing that provided some modicum of relief from her crippling anxiety. I immediately drafted a letter for Dory to provide to her apartment complex recommending that she be allowed to have Sasha with her.

On May 10, 2018 Dory messaged me that the property manager had forced her to speak with their lawyer and she anticipated needing me to complete an additional form. I told her that would be fine.

On May 11, 2018 Ms. Turnipseed provided me a detailed written history of her history of mental health issues and her prior diagnoses. Her written narrative was entirely consistent with what she had revealed during my initial evaluation by telephone. I sent Dory a request to meet via a video conference but she was more comfortable speaking over the phone and we went to over the details of her mental health history over the phone.
I never received any paperwork from her apartment complex.

On May 14, 2018 Ms. Turnipseed messaged me that she had not been contacted by the property manager regarding completing the paperwork to have Sasha live with her as an ESA. I asked how she was doing and she indicated she was feeling better after bringing Sasha to her apartment. Unfortunately, the improvement in her mental health was short lived as the apartment complex fined her more than $1000 because she had brought Sasha to her apartment and threatened to evict her if she did not pay the fine.
On May 15, 2018 I spoke with Ms. Turnipseed, who was having a serious mental health crisis after she received a letter from the apartment complex's attorney denying her request for accommodation and again demanding she immediately pay $1050, which she did not have. I suggested she speak with an attorney and provided her Ms. LaHart's contact information because Ms. LaHart had been recommended by a colleague.

**REQUEST FOR PRODUCTION RESPONSE**

1. May 5, 2018 email from Ray Curtis at USAServiceDogs.com referring Complainant to Dr. Friedman.

Dear Jeff Friedman,

We have assigned a new patient to you for an ESA evaluation. Please contact the patient at your earliest convenience and arrange a time to conduct the evaluation. Patient info is below. We have also sent your contact information to the patient as well, for convenience.

Patient Name: Dory Turnipseed

Phone: Not Provided

E-mail: █████████████

Stated Condition: Not provided

Best,

Ray

2. Email chain between witness Dr. Friedman and Complainant

| Sat, May 5, 2018, 3:41 PM | Complainant | Hi Dr. Friedman, I was writing to let you know I received a confirmation from USAservicedogs.org. My phone number is ████████ Email: █████████████ Work email: ████████████ I look forward to hearing from you. Regards, Dory Turnipseed |
| Sat, May 5, 2018, 4:29 PM | Friedman | Hello Dory, I am available to speak tomorrow afternoon |
| Sat, May 5, 2018, 5:06 PM | Complainant | That is perfect. Should I call you? Or what time? |
| Sat, May 5, 2018, 6:12 PM | Complainant | I apologize I wrote my phone number in correctly on my last email. My phone number is : ████████ |
| Sun, May 6, 2018, 11:18 AM | Friedman | sure call me a 9544949914 |
| Sun, May 6, 2018, 1:02 PM | Friedman | Jeffrey Friedman has attached the following document:

Hello Dory, Here is the letter. Nice speaking with you. |

| | | |
|---|---|---|
| Sun, May 6, 2018, 7:15 PM | Complainant | My only questions at this time are: Since you practice in Florida, will this be valid in Louisiana? Also, I was under the impression that only medical practitioners could write ESA letters. I could have gotten bad information online, but I wanted to ask.<br>Thank you so much<br>Dory Turnipseed |
| Sun, May 6, 2018, 7:21 PM | Friedman | Hello Dory,<br>Yes, good questions. No mental health professionals can write them as well. Ideally, you would not get someone from Louisiana to write. The law the fair housing act is a federal law the allows ESA to live with you. Its really about how strict they are at your apt complex. |
| Sun, May 6, 2018, 7:26 PM | Complainant | Thank you for your reply. I do not know why my current psychiatrist could not write the letter. My only guess is that it has to do with his residency program.<br>Anyway thank you for all your help. I truly appreciate it.<br>Dory |
| Sun, May 6, 2018, 7:42 PM | Friedman | You are welcome. |
| Mon, May 7, 2018, 4:44 PM | Complainant | One final question. They may want to call you and the phone number is not on the letter. Should I just give it to them separately? |
| Mon, May 7, 2018, 5:01PM | Friedman | Dory I prefer if they emailed any questions they have. |
| Thu, May 10, 2018, 4:24 PM | Complainant | I spoke with the property owner/manager and they had me speak with a legal representative and they are going to give me additional forms to fill out. One for me and one for you. Can I email that to you when I receive it? |
| Thu, May 10, 2018, 4:25 PM<br>Thu, May 10, 2018, 5:59 PM | Friedman<br>Friedman | Yes, that would be fine.<br>Hello Dory,<br>Could we set up at a time to have a video conference? Here is a link where I conduct them https://doxy.me/sofa . I would just like to be more familiar with your history before sighing anything. |
| Thu, May 10, 2018, 6:11 PM | Complainant | Yes absolutely. |
| Thu, May 10, 2018, 6:11 PM | Complainant | I would be available tomorrow after 3pm. Or any time Saturday or sunday |
| Thu, May 11, 2018, 9:28 AM | Complainant | I wrote out a brief history of myself and my dealings with psychiatric disorders last night after I gave up trying to fall asleep.<br>It may help narrow down or clarify your questions when we speak.<br>Thank you. |
| Fri, May 11, 2018, 3:00 PM | Friedman | Hello Dory,<br>Did you just call me? I just received a call from a Louisiana number. |

| | | |
|---|---|---|
| Fri, May 11, 2018, 3:46 PM | Complainant | I did not. I was just sending an email that I was off work and available to talk |
| Mon, May 14, 2018, 4:22 PM | Complainant | Hi Jeff,<br>I just wanted to keep you posted of the status of my reasonable accommodation request. As of now, I still have not gotten a phone call from the property owner/manager to meet and complete the paperwork. Should I email the lady I talked to last week?<br>Thanks,<br>Dory |
| Mon, May 14, 2018, 5:06 PM | Friedman | Hello Dory,<br>Sure. Sorry, I have not gotten back in touch with you. How are you doing now? |
| Mon, May 14, 2018, 5:10 PM | Complainant | I am doing much better now that I have Sasha here to keep me busy. They still haven't gotten in touch with me to fill out and give you the additional forms. I was just wondering if it was a good idea to email the lady I spoke with last week and see what's up. If I was still waiting around here without Sasha, I'd be losing it about now. |
| Mon, May 14, 2018, 8:31 PM | Complainant | Most recent update. I am not doing well because they left an "Animal Violation Notification" in my door stating that I now owe $1050.00 or face eviction for unauthorized animal in my apartment which has been photographed. I did email Ms. Sherri Roane, who I have been in contact with since last week. I told her that due to a decline in my mental stability exacerbated by this waiting process, I decided to move Sasha in on Saturday. I sent that email at 5:14pm and found this notice on my door at 7:00pm. I did print out my email to her, along with another copy of your letter, and left it in the door to the main office. I don't have any idea what to do but my anxiety levels are now through the roof. I am trying to do everything correctly by their procedures but I feel like I'm being made to suffer. How can they possibly know what goes through my head?<br>Please let me know if you have any advice. I truly feel lost now. |
| Tue, May 15, 2018, 6:19 PM | Friedman | Hello Dory,<br>I think this person is the one my friend recommended http://www.floridaanimallawyer.com/ I would contact her or if you can find someone similar in<br>Louisiana. |

| | | |
|---|---|---|
| Tue, May 15, 2018, 8:13 PM | Complainant | I have spoken with Marcy and she is willing to write a letter to the attorney for the property manager, but she would like to speak to you first. I am giving permission for you to disclose our conversations.<br>I hope this is okay.<br>Her email is marcy@floridaanimallawyer.com<br>And direct phone number is the one you gave me.<br>I can't thank you enough for all your help. |
| Tue, May 15, 2018, 8:29 PM | Friedman | Hello Dory,<br>I am happy you were able to get in touch with her. |

D. Factual Observations

Date of Observation: October 11, 2019
Investigator: Parker, Kimberly M.

The charges Respondent assess to Complainant includes her security deposit as a charge.  Respondents then give the Complainant a credit for $575, zeroing out any credit that would normally be applied to the charges.  So, instead of calculating the charges like this:

```
11,184.50
      25.00
      25.00
  +    2.00
_____
11,236.50
-   575.00
_____
10,661.50
```

Respondents do this:
```
11,184.50
    575.00
      25.00
      25.00
  +    2.00
_____
11,811.50
-   575.00
_____
11,236.50
```

Adding Complainant's security deposit as a charge and then crediting it to that total ensures that her deposit is not applied to any charges.

**SIGNATURE PAGE**

CASE FILE NO. <u>06-18-2185-8</u>

01/14/25
_____
Date

Chanel VanHook, Equal Opportunity Specialist

01/15/25
_____
Date

Patrick Banis, Enforcement Division Director

01/15/25
_____
Date

Christina Lewis, Director
Office of Fair Housing and Equal Opportunity, Region VI

# Table of Contents

**Interviews**

Complainant: Turnipseed, Dory; (B44)................................................................4

Complainant: Turnipseed, Dory; (B45)................................................................6

Other Witnesses: Mahony, Peter; (B46)..............................................................6

Complainant Contact: Other Witnesses: LaHart, Marcy; Friedman, Jeffrey; (B47)..................6

Complainant Representative Hutton, Sherri L. (B48)................................................7

Complainant: Turnipseed, Dory (B49)................................................................10

Complainant: Turnipseed, Dory (B50)................................................................11

Other Witnesses: Turnipseed, Margarethe (B53)......................................................12

Complainant: Turnipseed, Dory (B55)................................................................13

Respondent: Mamerto, Kim (C10)....................................................................15

Respondent: Roane, Sherri (C11)...................................................................16

Respondent Representative: Rather, Jr., James (C12)...............................................17

**Complainant Evidence**

Nature of Document: Animal Violation Notice from RP (B1)..........................................17

Nature of Document: Response to RP Opposition to Motion for Prelim Injunction (B2)........18

Nature of Document: Letter from Sherri Hutton to James Rather (B3................................18

Nature of Document: CP Email to EOS Walker (B4)..................................................19

Nature of Document: Judgment of Eviction (B5)....................................................19

Nature of Document: 20Jun18 1st Amended Complaint in USDC EDLA (B6)..........................20

Nature of Document: Emergency Motion for TRO and Prelim Injunction (B7).....................21

Nature of Document: Petition for Eviction filed by Respondents (B8)............................21

Nature of Document: CP Response to Final Notice to Pay (B9)....................................22

Nature of Document: Complainant Rep Letter (LaHart) (B10)......................................22

Nature of Document: 11Jun18 LaHart 2nd RA Req Email to Rather (B11).........................23

Nature of Document:  11-15Jun18 LaHart 2nd RA Req Emails to Rather (B12).....................23

Nature of Document: Complainant Damages Worksheets (B13).....................................25

Nature of Document: RP Requested Medical Release Document (B14)..............................25

Nature of Document: 11Jan23 CP Questionnaire (B15).............................................25

Nature of Document: Medical Records Documenting CEC (B16)....................................28

Nature of Document: 19May23 Questionnaire (B17)................................................28

Nature of Document: 30Jul18 Eviction Bill Sent to CP (2nd) (B18).................................29

Nature of Document: 10May18 CP Email to RP Roane Requesting RA Update (B19)...........29

Nature of Document: CP Response to RP Attorney Email (B20)............................................29

Nature of Document: 14May18 CP Emails with RP S Roane (B21).....................................30

Nature of Document: 16May18 Complainant Rep LaHart ltr to RP Rep Rather (B22) ...........31

Nature of Document: Hutton/LaHart Support Memo re Prelim INJ USDC EDLA (B23) .......33

Nature of Document: 16May18 RP Atty Rather Email to CP (B24) ........................................33

Nature of Document: 1Jun18 Receipt for Prorated Rent (B25) ...............................................33

Nature of Document: 13Jun18 Eviction Show Cause Order (B26) ........................................34

Nature of Document: Declaration of Dory Turnipseed (B27) ................................................34

Nature of Document: 15Aug18 Eviction Bill Sent to CP (3rd & Final) (B28)........................34

Nature of Document: ESA Docs Provided to RPs (B29)........................................................35

Nature of Document: ESA Letter: Mike Mahony, MD (B30) ................................................35

Nature of Document: Jeffrey Friedman Biography (B31) ......................................................35

Nature of Document: ESA Letter: Jeffrey Friedman, LCSW (B32).......................................36

Nature of Document: 11Jul18 Eviction Bill Sent to CP (1st) (B33) ......................................36

Nature of Document: 14May18 CP Email to RP Roane Re Update on RA (B34) ..................36

Nature of Document: 21Jun18 RP Notice to CP re: Rent (B35).............................................37

Nature of Document: 15May18 RP RA Denial from Rather (B36).........................................37

Nature of Document: 23May18 Hutton/LaHart USDC EDLA Complaint (B37)....................38

Nature of Document: CP's Chronology of Events (B38) ........................................................39

Nature of Document: Tonti Management Application Packet (B39)........................................40

Nature of Document: 1Jun18 RP Return of Funds Notice (B40)............................................40

Nature of Document: 28May18 RP Prorated Rent Notice to CP (B41)...................................40

Nature of Document: 13Jun18 RP Prorated Rent Notice to Complainant (B42)....................40

Nature of Document: 19Jun18 RP Prorated Rent Notice to Complainant (B43)....................41

Nature of Document: 15May18 CP Email to RP Atty James Rather (B51) .............................41

Nature of Document: 8Jun18 CP Email to EOS Barnes (B52)...............................................41

Nature of Document: CP Storage Rental Agreement (B54) ...................................................42

**Respondent Evidence**

Nature of Document: Representation Letter from James Rather (C1)......................................42

Nature of Document: Respondents' Answer to the Complaint (C2) .......................................42

Nature of Document: James Rather Email to EOS Walker (C3) .............................................42

Nature of Document: 9Feb23 RP Answer to Data Request (C4)............................................43

Nature of Document: 23Mar23 RP Answer to Pre Subpoena (C5) ........................................45

[Nature of Document: RP Fair Housing Statement (C6)](#).........................46

[Nature of Document: 10May21 RP Answer to Data Request (C7)](#) .............47

[Nature of Document: 18May21 RP Answer to Supp Data Request (C8)](#) ................48

[Nature of Document: Respondent Data Request Extension Request (C9)](#) .............49

[Nature of Document: 9Feb23 RP Answer to Data Request (C13)](#)........................50

[Nature of Document: J Rather Case Closure Request (C14)](#).......................50

[Nature of Document: J Rather Investigation Validity Question (C15)](#)...............50

[Nature of Document: 28Aug-9Sep2020 Request for Information Emails (C16)](#).....................51

[Nature of Document: Nov2023 RA Policy Inquiry to RP (C17)](#) ..............52

**Other Evidence**

[Nature of Document: RP's Motion to Compel Arbitration and Stay (D1)](#) ...............52

[Nature of Document: Complainant Response in Opposition to Compel Arbitration (D2)](#) ........53

[Nature of Document: Supplemental Memo Opposing TRO (D3)](#) ............53

[Nature of Document: Order Granting Motion to Compel Arbitration (D4)](#)...................55

[Nature of Document: Order Denying TRO (D5)](#) ........................55

[Nature of Document: 15Mar23 Pre Subpoena Letter (D6)](#) ................55

[Nature of Document: Data Request (D7)](#) ..................55

[Nature of Document: 9Dec22 RP USDC EDLA Motion to Dismiss (D8)](#).................56

[Nature of Document: 9Jan23 Complainant USDC EDLA Appeal of 9Dec22 Motion (D9)](#) ....56

[Nature of Document: 13Feb23 5th Cir. Voluntary Dismissal (D10)](#) ...............57

[Nature of Document: 14Feb23 5th Cir. Dimissal Order (D11)](#)......................57

[Nature of Document: BMC Medical Informatics & Decision Making Journal Article (D14)](#) .57

[Nature of Document: Journal of General Internal Medicine Article on Telemedicine (D15)](#) ..59

**Interrogatories**

[First Interrogatory Sent To: Jeffrey Friedman (D12)](#) ..................61

[Second Interrogatory Sent To: Jeffrey Friedman (D13)](#) ....................64